## Commonwealth vs. Joann Sliech-Brodeur.

Hampden. November 6, 2009. - July 19, 2010.

Present: Marshall, C.J., Cowin, Cordy, Botsford, & Gants, JJ.

*Homicide. Constitutional Law,* Search and seizure, Self-incrimination. *Search and Seizure,* Plain view. *Practice, Criminal,* Capital case, Discovery, Psychiatric examination, Instructions to jury. *Mental Impairment. Rules of Criminal Procedure. Witness,* Expert. *Evidence,* Expert opinion, Scientific test, Privileged communication.

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress certain evidence (a letter and twenty-two small notes written by the defendant) found by police while executing a search warrant at the crime scene (the home the defendant shared with the victim), where, although the warrant did not expressly authorize the search or seizure of documents, all the challenged documents were in plain view of the officers, who were lawfully in a position to view the documents and had a lawful right of access to those items; where, in light of what was known at the time, the police could permissibly conclude that the letter was plausibly related to the murder; where the incriminating nature of the notes was immediately apparent; and where the discovery of the documents was inadvertent. [305-310]

This court concluded that, where Mass. R. Crim. P. 14 (b) (2) exclusively governs pretrial discovery relating to a defense of lack of criminal responsibility, and where nothing in that rule obligates a defendant, before trial, to provide the Commonwealth's expert with copies of the defendant's own expert witness's notes and other materials relating to such a defense, a Commonwealth expert was not entitled to receive such materials from a defense expert; in particular, the Commonwealth expert was not entitled to any such materials before trial and before he had even prepared his own report and, as to much of the material, probably not at all. [314-321] Gants, J., dissenting, with whom Cowin, J., joined.

This court could not say that error arising from certain pretrial discovery orders in a criminal case, which improperly obligated the defendant to provide the Commonwealth's expert before trial with copies of the defendant's own expert witness's notes and other materials relating to a defense of criminal responsibility, was nonprejudicial and therefore harmless, where the over-all strength of the Commonwealth's case relied heavily on its expert's testimony, which was based on a review of a large quantity of materials that were erroneously provided; therefore, this court reversed the defendant's conviction and remanded the matter for a new trial. [321-324] Gants, J., dissenting, with whom Cowin, J., joined.

Statement clarifying the sequence of production of mental health experts' materials in criminal cases involving a defense of lack of criminal responsibility. [324-326] Gants, J., dissenting, with whom Cowin, J., joined.

Discussion of issues likely to arise on retrial of a murder case. [326-330]

INDICTMENT found and returned in the Superior Court Department on September 29, 2004.

A pretrial motion to suppress evidence was heard by *Timothy S. Hillman*, J.; a motion for discovery regarding scientific testimony was heard by *Bertha D. Josephson*, J.; a motion to compel was heard by *Constance M. Sweeney*, J.; and the case was tried before *C. Brian McDonald*, J.

*Wendy H. Sibbison* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

*Philip G. Cormier*, for Committee for Public Counsel Services & another, amici curiae, submitted a brief.

BOTSFORD, J. A jury found the defendant guilty of murder in the first degree of Joseph Brodeur, her husband, on theories of deliberate premeditation and extreme atrocity or cruelty. The events giving rise to the charge occurred on July 28, 2004. At trial, the defendant argued that she was not criminally responsible for her husband's death. The defendant appeals from her conviction, challenging, inter alia, the denial of her motion to suppress certain evidence found in a search of her home; the scope of pretrial discovery orders, granted on motion of the Commonwealth, that concerned her defense of lack of criminal responsibility; and a number of rulings by the trial judge. We conclude that the defendant's motion to suppress was properly denied, but because we further conclude that the discovery orders violated Mass. R. Crim. P. 14 (b) (2), as appearing in 442 Mass. 1518 (2004), and prejudiced the defendant, we reverse her conviction. We consider briefly additional issues raised by the defendant that may arise at a retrial.[1]

1. *Background.* We summarize the facts that the jury could have found based on the evidence introduced at trial.

The victim and the defendant were married in 1994, when he was sixty years old and she was forty-nine. Both had been married previously and both had children from their prior marriages; they had no children together. The couple lived at 56

---

[1] We acknowledge the amicus brief filed on behalf of the defendant by the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers.

Bear Hole Road in West Springfield but spent part of the year, from October to May, in Florida.

Although some of their friends described the couple as having a "wonderful time" together and a "good relationship," they were not without marital difficulties. Financial and sexual issues strained the marriage. The victim gave the defendant monthly invoices for her share of each household expense, broken down to the penny, despite the fact that the defendant did not like and complained about the arrangement. Each year in or around April, the victim and the defendant argued about the payment of taxes. In March of 2004, approximately four months before the victim was killed, the defendant reported to Florida police that her pocketbook had been stolen. However, after the victim went to the police the following month claiming that the pocketbook was never missing and asserting that the defendant had filed a false insurance claim, the defendant came to believe that the victim had taken and hidden the pocketbook. Also in March, 2004, while the defendant and the victim were still in Florida, the victim made arrangements with his daughter and one of his friends secretly to move a file cabinet that contained the couple's financial documents out of their Bear Hole Road home and into the basement of his daughter's house. In June, 2004, the victim threatened the defendant that he was going to subpoena the defendant's bank records and accused her of converting certificates of deposit to cash.[2]

In February and March, 2004, the victim, while in Florida, separately telephoned his daughter and his friend and indicated that he and the defendant were going to divorce. Nevertheless, in May, 2004, the couple returned from Florida and resumed

[2]With respect to sexual issues, medical records in evidence indicated that over the years the defendant had complained of intense pain and soreness during and after sexual intercourse. In addition to the medical records evidence, Dr. Daniel Brown, the defendant's expert witness on criminal responsibility, testified to a number of statements the defendant had made to him about how the victim was "almost obsessed [with sex]," the victim's domineering and repeated insistence on having sexual intercourse with the defendant, and the defendant's pain, which was often so intense that she cried. These statements were not admitted for their truth but for the limited purpose of providing information that formed the basis of Dr. Brown's opinions about the defendant's mental state and specifically his opinion that the defendant felt controlled by the victim.

living together at their West Springfield home. Despite having independent financial resources and being unhappy, the defendant refused to move out of the home because she wanted to protect a claim to her half of the property. On July 26, two days before the victim's death, the victim stated that he was going to continue with divorce proceedings.

On July 28, 2004, between 9 and 9:30 P.M., the defendant telephoned her son, John Sliech, who was with his girl friend, Kathy Gilberti, at his home in Westfield; the defendant stated there was a "problem." Sliech and Gilberti left immediately for the defendant's home at Bear Hole Road. Once they arrived and Sliech went into the house, he telephoned the police. At approximately 9:45 P.M., the first police officer arrived in response to the call, and observed Gilberti consoling the defendant, who was upset and mumbling, on the couch. The officer heard the defendant say, "He hit me." Another officer, Sergeant Thomas Wilkinson, followed a blood trail on the family room carpet into the dining room, and observed the victim lying under a portion of the dining room table, covered with a sheet, with his feet protruding. The victim was wearing only a blood-soaked T-shirt. Lividity[3] was apparent in his jaw and feet. The victim had thirty-four distinct knife wounds to his head, neck, chest, and back and no defensive wounds. He died from a loss of blood from three or four of the wounds, one of which went through his chest and penetrated his left lung and heart.

After observing the victim's body, Sergeant Wilkinson was told by Gilberti that the defendant may have overdosed on medication, and he so informed the ambulance personnel. The defendant reported to the paramedic who was part of the ambulance team that she had a history of depression and fibromyalgia and that she had ingested twenty-five Klonopin pills; she stated she wanted to kill herself. During her conversation with the paramedic, the defendant was able to respond to questions appropriately and coherently, and she was at the highest level for all functions tested, including alertness, pupil dilation, eye opening, and verbal and motor responsiveness.

The defendant was transported by ambulance to Baystate

---

[3]Lividity is the pooling of blood at lower levels of the body and begins thirty minutes after death. It becomes more pronounced after four hours.

Medical Center. On the way to the hospital, and again at the hospital, the defendant indicated that she took the medication because "she wanted to kill herself." The following day, July 29, the defendant was released from the hospital.

A subsequent search of the defendant's Bear Hole Road home by the police revealed, with respect to the master bedroom, a large amount of blood on the bed, the bed sheets pushed down, a broken lamp pushed out of its original place, and a "balled up" comforter and a pillow with bloodstains. Blood, bloodstains, and blood spatter were observed in the master bedroom, around the front door of the house, on the landing outside the front door, and in the dining room where the victim's body was found. The police found a bloody knife and small crowbar on a towel in the bathroom, near to which lay a woman's watch and two rings. One of the rings tested positive for blood, as did the sink faucet, the sink drain, and the bathtub faucet.

During their search, the officers also discovered and seized from the kitchen counter a letter written on lined paper with the name "Howard Safford"[4] at the top; twenty-two small, yellow "notes" affixed to items throughout the house, each bearing the name of one of the defendant's sons and her signature; and a looseleaf notebook containing mementos of the victim's granddaughter, who had died of leukemia. This last item contained a note dated six days before the murder addressed to the victim's daughter and son-in-law; it read, "I kept these. Now they are yours. Love, Joann."

After the Commonwealth rested at the end of its direct case, the defendant presented evidence on the issue of her criminal responsibility on the day of the homicide. Dr. Daniel Brown, a licensed forensic psychologist retained by the defendant as an expert witness, testified. Dr. Brown had spent a total of twenty-six and one-half hours interviewing the defendant and conducting a series of psychological tests, including the Minnesota Multiphasic Personality Inventory (MMPI), and a series of tests to assess the accuracy and validity of the defendant's self-reported symptoms and memory loss. Based on his interviews and the results of the testing, Dr. Brown determined the defend-

[4]At all relevant times of this case, Howard Safford was an assistant district attorney for the Hampden district.

ant was generally an overcontrolled person, had a dependent personality, and felt very much controlled by the victim. She compartmentalized her anger so that she would not feel or experience it, but in response to the stressful events that occurred leading up to and on July 28, 2004, the defendant "lost it." In particular, she had a substantial loss of awareness; she could neither see nor hear; and she was not cognizant of what was taking place. In Dr. Brown's opinion, on July 28, 2004, the defendant suffered from five psychiatric disorders he characterized as types of mental diseases or defects: major depressive disorder, posttraumatic stress disorder, mixed personality disorder with dependent features, dissociative amnesia, and dissociative disorder not otherwise specified. He concluded that, as a result of these mental diseases or defects, the defendant could not appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law.

In rebuttal, the Commonwealth called Dr. Martin Kelly, a forensic psychiatrist, who had been appointed at the Commonwealth's request to perform an evaluation of the defendant pursuant to rule 14 (b) (2) (B) and who interviewed the defendant for a total of two hours and forty-five minutes. Dr. Kelly opined that the defendant had no history of a mental disease or defect and did not suffer from one on July 28, 2004. She therefore had, in his opinion, the substantial capacity to appreciate the wrongfulness of her conduct, could conform her conduct to the requirements of the law on that date, and did not lack criminal responsibility.[5]

2. *Discussion.* a. *Motion to suppress.* The defendant moved before trial to suppress certain items of physical evidence, including the letter found on lined paper in the kitchen of the Bear Hole Road residence and the twenty-two small, yellow notes found in its garage, cellar, and office. After an evidentiary hearing, a Superior Court judge (first motion judge) denied the motion on the grounds that all the challenged documents were in plain view of the officers, who were conducting a valid search of the residence pursuant to a warrant.[6] The defendant now challenges that ruling.[7] There was no error.

---

[5]We later review additional aspects of pretrial proceedings and the trial in connection with our discussion of the issues raised.

[6]On July 29, 2004, a search warrant was issued for 56 Bear Hole Road. It

"In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing." *Commonwealth* v. *Contos*, 435 Mass. 19, 32 (2001), quoting *Commonwealth* v. *Eckert*, 431 Mass. 591, 592-593 (2000). However, we review independently the motion judge's application of constitutional principles to the facts found. *Commonwealth* v. *Contos*, *supra*.

The search warrant issued for the Bear Hole Road residence did not expressly authorize the search or seizure of documents. As a consequence, the seizure of the documents in question is presumptively unreasonable, and the Commonwealth bears the burden of demonstrating that an exception to the warrant requirement applies. *Commonwealth* v. *Balicki*, 436 Mass. 1, 8 (2002).

The plain view doctrine is an exception to the warrant requirement. *Id*. See *Coolidge* v. *New Hampshire*, 403 U.S. 443, 465 (1971); *Commonwealth* v. *Santana*, 420 Mass. 205, 211 (1995), and cases cited. Under the Fourth Amendment to the United States Constitution, the plain view doctrine applies (1) where the police are lawfully in a position to view the object; (2) where the police have a lawful right of access to the object; and (3) in cases concerning (a) contraband, weapons, or other items illegally possessed, where the incriminating character of the object is immediately apparent, see *Horton* v. *California*, 496 U.S. 128, 136 (1990); *Commonwealth* v. *D'Amour*, 428 Mass. 725, 731 (1999) (*D'Amour*); or (b) other types of evidence ("mere evidence"), where the particular evidence is plausibly related to criminal

authorized police both to videotape and photograph "the scene" and to search for:

> "Blood, semen, saliva, physiological fluids and secretions, hair, fibers, fingerprints, palm prints, foot prints, snow prints, soiled and blood soaked clothes, any instrument or weapon that may have been used to cause the death of [the victim], marks of tools to gain access to locked premises or containers and items containing traces of any of the above mentioned articles including drains and sewers, telephones, and answering machines."

[7]The letter and notes (as well as the looseleaf notebook with mementos) were seized along with a number of items that fit within the scope of the items described in the warrant. The defendant does not challenge the validity of the warrant or the seizure of any items other than the letter and the notes.

activity of which the police are already aware. See, e.g., *Commonwealth* v. *Accaputo*, 380 Mass. 435, 447-448 (1980); *Commonwealth* v. *Bond*, 375 Mass. 201, 206 (1978). Article 14 of the Massachusetts Declaration of Rights adds the requirement that the police come across the object inadvertently. See *Commonwealth* v. *Balicki*, 436 Mass. at 9-10 (declining to abandon inadvertence requirement under art. 14).

The defendant acknowledges that the police officers were lawfully in a position to view both the letter and the twenty-two notes. See *D'Amour*, 428 Mass. at 731 (only requirement to justify presence of police in defendant's home is valid search warrant). She disputes, however, that the officers had a lawful right of access to these items. Police officers generally have such a right if the "terms of the warrant entitle [the officers] to search where the object[s] [are] found." *Id.* Here, the first motion judge determined that the search warrant authorized the videotaping or photographing of the "crime scene," and that the entire interior of the house constituted the crime scene. He also found that the objects of the search that were described in the warrant — such as blood, saliva, hair, fibers, fingerprints, and weapons — could have been found anywhere in the house. For both these reasons, the judge concluded, the police officers had a lawful right of access to the particular areas where the letter and notes were discovered.

On appeal, the defendant does not challenge that conclusion. Rather, she claims that although the officers may have been lawfully in the rooms in which the writings were found, they were not entitled to read the documents for content. In making this claim, the defendant distinguishes *D'Amour*, where this court concluded that the officers were permitted to "examine [a letter] 'cursorily.' " *D'Amour*, 428 Mass. at 731. According to the defendant, the officers in *D'Amour* were permitted to conduct their cursory examination only because the warrant itself authorized the search for and seizure of certain documents, see *id.* at 728, and the only way the officers could know whether a writing was within the scope of the warrant was to examine the document's content. However, because the warrant in this case did not cover any writings or documents, the defendant argues that the officers had no reason to give the letter or the notes any examination at all.

We disagree. Although the warrant for the defendant's home did not authorize the officers to search for or seize documents or writings, it would be unrealistic to require officers to ignore what is immediately in front of them. See, e.g., *United States* v. *Crouch*, 648 F.2d 932, 933 (4th Cir.), cert. denied, 454 U.S. 952 (1981) (during search pursuant to warrant that did not authorize search for documents or writings, officers discovered incriminating letters; court attached no significance to "the fact that some cursory reading of the letters was necessary in order to establish their nature"); *United States* v. *Ochs*, 595 F.2d 1247, 1257 n.8 (2d Cir.), cert. denied, 444 U.S. 955 (1979) ("A number of courts . . . have upheld without much discussion the seizure of documents during an otherwise valid search as in 'plain view' notwithstanding the fact that some perusal, generally fairly brief, of the documents was clearly necessary in order for the police to perceive the relevance of the document to crime"). See also 2 W.R. LaFave, Search and Seizure § 4.11(d), at 793 (4th ed. 2004).

The defendant further argues that the plain view doctrine was inapplicable here because the letter and the notes did not have an immediately apparent incriminating character, the third requirement of the doctrine. See *D'Amour*, 428 Mass. at 730. Trooper Frydryk, who was in charge of videotaping the crime scene, was the first to see the letter on the kitchen counter. He was able to view the phrases "Howard Safford," "Joe has," "verbally and emotionally," "divorce," and "take everything." The trooper knew Safford to be an assistant district attorney, knew the victim had died in the house, and knew the victim's first name was Joseph (or Joe). Additionally, the officers executing the search warrant for 56 Bear Hole Road knew that the victim and the defendant were in the midst of an impending divorce. While we do not agree with the motion judge that the incriminating nature of the letter was "immediately apparent," in light of what was known at the time, the trooper could permissibly conclude that the letter was "plausibly related . . . to criminal activity of which [he was] already aware." *Commonwealth* v. *Bond*, 375 Mass. 201, 206 (1978) ("[m]ere evidence" may be seized under plain view doctrine only if police recognize plausible connection to criminal activity known to them). See *D'Amour*,

428 Mass. at 731; *Commonwealth* v. *Accaputo*, 380 Mass. 435, 447-448 (1980).[8]

With respect to the notes, twenty of the twenty-two were found affixed to specific items of property throughout the house.[9] Each note mentioned the name of either of the defendant's sons and almost all of them also contained the defendant's signature. The motion judge determined that the incriminating nature of the notes was immediately apparent because they appeared to reflect bequests of the property to which they were attached. See *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 33 (1943) ("An attempt to commit suicide . . . may indicate the efforts of a guilty person to avoid punishment for his crime"). Given the large quantity of notes and the fact that they were found in various rooms, recognizable as bequests, and signed by the defendant who at the time of the search had recently been taken to the hospital because an overdose of Klonopin, we agree.

The defendant further maintains that the seizure of the letter and notes cannot be justified under the plain view doctrine because Trooper Frydryk and his fellow officers did not discover the writings inadvertently. For a discovery to be inadvertent, the "police [must] lack[] probable cause before entering the room to believe the items would be there." *D'Amour, supra* at 732,

---

[8]The fact that a handwritten letter addressed to an assistant district attorney was on the defendant's kitchen counter, by itself, was not and would not be incriminating. Our determination that the letter was properly seized results from the additional words that could be seen by the trooper, and the other officers to whom the trooper mentioned the letter, without moving the "date book" that was lying on top of the letter. Contrast *Arizona* v. *Hicks*, 480 U.S. 321, 324-326 (1987) (moving stereo equipment to read serial numbers printed on back constituted search separate and apart from initial, authorized search; this separate search was not justified by plain view doctrine, thus independent showing of probable cause required). In light of the officers' state of knowledge concerning the crime at issue, the words visible to them provided enough to justify their belief that the letter contained evidence regarding motive. See *Commonwealth* v. *D'Amour*, 428 Mass. 725, 730-732 (1999) (letter was in plain view and properly seized because after "scann[ing]" letter, "it became immediately apparent that [the police] stumbled on evidence of a motive on the part of the defendant for killing her husband").

[9]Two of the twenty-two notes were initially hidden from view: one was found in a drawer containing clothing, and the other was found inside a piece of computer furniture. Testimony confirmed that police officers stumbled on these two notes as they searched for bloody clothing and other items of evidence listed in the warrant.

quoting *Commonwealth* v. *Cefalo*, 381 Mass. 319, 331 (1980). Detective Sergeant Harlow, who had assumed control of the crime scene and had performed a protective sweep of the Bear Hole Road house before the issuance of the search warrant, testified that he did not see the letter or the notes during his initial walk-through of the house and did not anticipate finding these or any writings. The motion judge credited this testimony and concluded that the officers did not recall seeing the letter or the notes in the "chaotic situation" they confronted. We have no reason to disagree with the judge's finding.

In sum, the record supports the conclusion of the motion judge that for both the defendant's letter and the notes, each of the requirements of the plain view doctrine was met. The judge properly denied the defendant's motion to suppress this evidence.

b. *Discovery orders.* The defendant objects to various discovery orders that compelled, prior to trial, the disclosure of many pages of notes, reports, and statements generated by Dr. Brown, her expert witness, to the Commonwealth's selected psychiatric examiner, Dr. Kelly and, later, to the prosecution. We first summarize the procedural history of these discovery orders to provide necessary context.

(i) On December 5, 2005, the defendant filed a written notice of her intent to present a defense of lack of criminal responsibility pursuant to rule 14 (b) (2) (A)[10]; the notice indicated that Dr. Brown would rely on statements made by the defendant regarding her mental condition at the time of the alleged crime. See Mass. R. Crim. P. 14 (b) (2) (A) (ii) and (iii). In response, the Commonwealth moved, unopposed, for an independent examination by Dr. Kelly. Mass. R. Crim. P. 14 (b) (2) (B). On the same day that the Commonwealth filed this motion, December 16, 2005, the Commonwealth also moved to compel the defendant to produce, as part of pretrial discovery, the following items:

"1. A resume or curriculum vitae of Dr. Daniel Brown.

---

[10]Rule 14 (b) (2) (A) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), provides in relevant part: "If a defendant intends to rely upon the defense of lack of criminal responsibility because of mental disease or defect at the time of the alleged crime, the defendant shall . . . notify the prosecutor in writing of such intention."

"2. Copies of all documents of whatever kind that were reviewed by or provided to Dr. Daniel Brown, relating to the defendant.

"2 [*sic*]. Copies of all reports or correspondence by Dr. Daniel Brown, relating to the defendant.

"3. Copies of all medical or psychiatric examinations, tests or evaluations that have been administered to the defendant, together with copies of all test materials, including answers, scoring materials and notes of the examiner.

"4. If not contained within the materials previously requested, a summary of all statements of the defendant made to Dr. Daniel Brown, regardless of whether or not they were relied upon by Dr. Brown in reaching any conclusion or opinion regarding the defendant's mental state.

"5. If not contained within the materials previously requested, a summary of the expected testimony of Dr. Daniel Brown, including any opinion testimony that the defendant seeks to introduce, together with the basis for such opinion."

After a hearing, and over the defendant's objection, on December 16, 2005, a judge in the Superior Court (second motion judge) allowed the Commonwealth's motion with respect to three of the requested categories: Dr. Brown's resume or curriculum vitae; "copies of all reports or correspondence by Dr. Daniel Brown relating to the defendant"; and "copies of all medical or psychiatric examinations, tests or evaluations that have been administered to the defendant, together with copies of all test materials, including answers, scoring materials and notes of the examiner." The remaining requests were denied without prejudice.[11]

The defendant filed a petition in the county court under G. L. c. 211, § 3, for relief from this discovery order. On January 19, 2006, a single justice of this court denied the request.[12] The Commonwealth then moved in the Superior Court to compel

[11]The second motion judge clarified her December 16, 2005, discovery order on December 30, 2005; the summary in the text above reflects the substance of the discovery order as modified.

[12]The defendant appealed to this court from the judgment of the single

compliance with the discovery order, and on January 24, 2006, a third Superior Court judge allowed the motion. The defendant again sought relief from the single justice, requesting a stay of the December 16 discovery order, as clarified (see note 11, *supra*), and the January 24 compliance order. The single justice denied the stay request on January 26, 2006, but modified his original order to require that (1) the materials previously ordered produced be given to the Commonwealth's expert, Dr. Kelly; and (2) Dr. Kelly not be permitted to "share any statements of [the defendant] with the prosecution except upon further order of the Superior Court."[13] Also on January 26, 2006, Dr. Kelly examined the defendant.

Following the single justice's denial of the motion to stay, the defendant complied with the pretrial discovery orders (see note 13, *supra*), and sent Dr. Kelly a package of over 200 pages of materials generated by Dr. Brown in connection with his interviews and testing of the defendant (materials, or Dr. Brown's materials).[14] The materials contained nine single-spaced typed pages of notes documenting the defendant's statements to Dr. Brown, including a section of approximately four pages with the heading, "Joann Brodeur's Memory for the 7/28/04 Incident (constructed from several free recall attempts)"; notes taken by Dr. Brown during his various interviews of the defendant; and all of her psychological test answers and results.[15] The Com-

justice, but the appeal was dismissed as moot in June of 2006, following the defendant's conviction. See *Sliech-Brodeur* v. *Commonwealth*, 447 Mass. 1004 (2006).

[13]The second motion judge's December 16, 2005, discovery order, as clarified on December 30, 2005; the compliance order dated January 24, 2006; and the January 19, 2006, order of the single justice, as modified on January 26, 2006, are referred to collectively in this opinion as the pretrial discovery orders.

[14]Dr. Brown interviewed the defendant for a total of fifteen hours on six different dates, and he spent another ten and one-half hours conducting psychological tests.

The defendant claims these materials were sent to Dr. Kelly on January 27, 2006; the Commonwealth asserts that the materials were not received until January 30, 2006. The difference in these dates is not material to our decision.

[15]When the defendant's appeal was docketed in this court, she moved to expand the record to include, inter alia, an "exemplar" of Dr. Brown's materials that included the nine single-spaced pages of the defendant's statements. The Commonwealth did not oppose the motion, and on January 29, 2010, we allowed it.

monwealth subsequently moved to compel production of a synopsis of Dr. Brown's ultimate opinion, which the trial judge denied after hearing on February 8, 2006, because Dr. Kelly's report, see Mass. R. Crim. P. 14 (b) (2) (B) (iii),[16] had not yet been filed with the court and was not available to the defendant.

Dr. Kelly filed his written report with the court on February 13, 2006, the first day of trial. In that report, Dr. Kelly stated that he based his opinion concerning the defendant's mental state in part on his review of various items submitted by Dr. Brown, including "a type-written series of pages entitled Joann Sliech-Brodeur's alleged memory of incident, re-constructed from several free recall attempts, hand-written materials probably from Dr. Brown, which appear to be interview notes of several sessions," and "review of extensive psychological testing . . . ." After determining that the report itself did not contain privileged material, the judge released it to both parties. However, on the following day, February 14, the judge concluded that Dr. Kelly's report did not conform to the requirements of rule 14 (b) (2) (B) (iii) because it did not contain his findings "including specific statements of the basis thereof, as to the mental condition of the defendant at the time the alleged offense was committed," and he ordered Dr. Kelly to supplement his original report. At the same time, after noting that the defendant did not object to a reciprocal order, the judge ordered Dr. Brown to file with the court a report "stating his findings as to the defendant's mental condition on July 28, [2004], specifically including whether she suffered any mental illness, disease, or defect, and, if so, whether such illness, disease, or defect or combination thereof, resulted in either the lack of substantial capacity to appreciate the wrongfulness or criminality of her conduct or resulted in the lack of substantial capacity to conform her conduct to the requirements of the law."

In accordance with the judge's orders, Dr. Kelly filed a supplement to his report, and Dr. Brown also filed a report. On February 16, 2006, following completion of jury empanelment and

---

[16]Rule 14 (b) (2) (B) (iii) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), provides in part: "The examiner shall file with the court a written psychiatric report which shall contain his or her findings, including specific statements of the basis thereof, as to the mental condition of the defendant at the time the alleged offense was committed."

after the opening statements by counsel, the judge ordered both
Dr. Brown's report and Dr. Kelly's supplemental report released
to the parties. The judge also allowed, over the defendant's
objection, the Commonwealth's motion for permission to discuss
the defendant's statements with Dr. Kelly, including the state-
ments of the defendant that Dr. Brown had previously turned
over to Dr. Kelly in accordance with the pretrial discovery
orders.[17] In response, the Commonwealth agreed to provide
reciprocal discovery of any statements the defendant had made
to Dr. Kelly during his examination of her. Dr. Kelly, however,
had made no record of any of the defendant's statements con-
cerning the day of the victim's death, and therefore nothing was
provided to the defendant.

(ii) The defendant argues that the pretrial discovery orders,
compelling the production of her statements and Dr. Brown's
notes and testing materials to Dr. Kelly before trial, violated
one or more of the following: the discovery provisions of rule
14 (b) (2); the work product provisions of Mass. R. Crim. P.
14 (a) (5), as appearing in 442 Mass. 1518 (2004); the psycho-
therapist-patient privilege codified at G. L. c. 233, § 20B; and
the State and Federal constitutional guarantees of due process
and protection against self-incrimination.[18] She raises similar

---

[17]The judge's order came after the defense counsel's opening statement in
which he mentioned that Dr. Brown would be called as an expert witness and
summarized Dr. Brown's anticipated testimony, but did not include in that
summary any reference to specific statements the defendant had made to Dr.
Brown.

[18]The Commonwealth argues that the defendant has waived any objection
to the discovery of her statements to Dr. Brown, contending that the pretrial
discovery order of the second motion judge did not specifically require Dr.
Brown to turn over to Dr. Kelly the statements of the defendant, but the
defendant nonetheless turned over copies of all Dr. Brown's materials, includ-
ing the defendant's statements, without redaction. We disagree that a waiver
occurred. Paragraph four of the Commonwealth's discovery motion certainly
implies that the first three paragraphs — which the second motion judge al-
lowed in her discovery order — were intended to secure production of the
defendant's statements to Dr. Brown. This view is confirmed by the orders of
the single justice upholding the Superior Court judges' pretrial discovery
orders and directing that "any statements of [the defendant]" be provided to
Dr. Kelly. In the circumstances, we conclude that the defendant could reason-
ably interpret the pretrial discovery orders as compelling her to produce the
statements she made to Dr. Brown. As she repeatedly objected to these orders,
her claim of error with respect to disclosure of her statements and other parts
of Dr. Brown's materials is preserved.

challenges to the order that permitted Dr. Kelly to discuss with the prosecutor the defendant's statements. We agree with the defendant that the discovery orders permitting Dr. Kelly to receive Dr. Brown's materials contravened the constitutionally based limitations on discovery related to a defense of lack of criminal responsibility pursuant to rule 14 (b) (2). We do not consider the defendant's other rule-based and statutory grounds on which she challenges both orders.

By its terms, rule 14 (b) (2) describes the "[s]pecial procedures" that govern pretrial discovery related to the defense of lack of criminal responsibility.[19] As explained in the Reporters' Notes to Rule 14 (b) (2), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure 1506 (LexisNexis 2008-2009), rule 14 (b) (2) "substantially restate[s] [the procedures] dictated by" this court in *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977) (*Blaisdell*), and so we turn to that case.

The specific questions raised in *Blaisdell* were (1) whether a defendant who sought to interpose an insanity defense could be precluded from presenting his own expert psychiatric testimony at trial if he refused to submit to and cooperate in a psychiatric examination sought by the Commonwealth and ordered by the court pursuant to G. L. c. 123, § 15; and (2) if the defendant did cooperate in the examination, to what extent could the court-appointed psychiatrist's report or testimony be used at trial. *Blaisdell*, 372 Mass. at 755 n.1. The court concluded that a psychiatric interview seeking to examine the defendant's mental state at or about the time of the crime implicates the defendant's privilege against self-incrimination, because the examination will or may require the defendant to provide, in the form of

[19]Since 1979, when this court first adopted the Massachusetts Rules of Criminal Procedure, 378 Mass. 842 (1979), we have not changed the procedures codified in rule 14 (b) (2). We have, however, expanded its application to defenses beyond that of lack of criminal responsibility. See, e.g., *Commonwealth* v. *Ostrander*, 441 Mass. 344, 352, cert. denied, 543 U.S. 867 (2004) (alleged inability voluntarily to waive Miranda rights); *Commonwealth* v. *Contos*, 435 Mass. 19, 23-27 (2001) (alleged inability to premeditate). See generally *Commonwealth* v. *Diaz*, 431 Mass. 822, 829 (2000) ("Although *Blaisdell* concerned the defense of lack of criminal responsibility, this court has implicitly recognized that the procedures set forth in that case and rule 14 [b] [2] [B] should be applied where the defendant raises an issue regarding his mental impairment"); *Commonwealth* v. *Harvey*, 397 Mass. 803, 807 n.2 (1986).

statements — characterized by the court as " 'testimonial' in every sense of the word," *id.* at 760 — inculpatory information about not only the crime itself but also about his mental capacity at the time of the crime. *Id.* Accordingly, a court-ordered psychiatric examination of a defendant in these circumstances cannot take place unless there is constitutionally adequate immunity available, see *id.* at 761-764, or, in the absence of immunity, a voluntary waiver by the defendant of his privilege against self-incrimination. *Id.* at 761, 764, 766. See *Commonwealth* v. *Baldwin,* 426 Mass. 105, 109-110 (1997), cert. denied, 525 U.S. 820 (1998).

On the issue of waiver,[20] the court set out the established proposition that "[w]hen a defendant in a criminal proceeding voluntarily takes the stand to testify, that act is a waiver of his entire privilege as to any facts material to the crime for which he is being tried." *Blaisdell,* 372 Mass. at 764. The court went on, however, to conclude that where a defendant raising an "insanity" defense intends to rely at trial not on his own testimony but on the testimony of an expert witness whose opinion is based on testimonial statements of the defendant pertaining to the defendant's mental state at or about the time of the commission of the crime, the expected proffer of such expert's testimony acts as a waiver of the defendant's privilege to the extent that the defendant may be ordered to submit to an independent psychiatric examination by a psychiatrist of the Commonwealth's or the court's choosing.[21] *Id.* at 766. The court then considered whether the Commonwealth was obliged to wait until the defendant's

---

[20]Before reaching waiver, the court first rejected the Commonwealth's claims that statutes relating to a defendant's communications with a psychiatrist, see G. L. c. 233, §§ 20B and 23B, provided immunity to a defendant that was coextensive with the privilege against self-incrimination, and therefore constitutionally adequate. *Blaisdell* v. *Commonwealth,* 372 Mass. 753, 761-764 (1977) (*Blaisdell*).

[21]The dissent states that the privilege against self-incrimination "does not apply to a defendant's statements to the psychiatrist retained by his attorney because these statements were not compelled by the Commonwealth or the court." *Post* at 340. While a defendant's communications with his own psychiatric expert may be voluntary, that is beside the point in this case. At issue here are court orders requiring the defendant's expert to disclose the defendant's statements — presumably concerning the crime at issue or her mental state at the time of the crime, or both — to the prosecution's expert witness. The defendant's privilege against self-incrimination applies to and protects against that compelled disclosure of her statements to the prosecution unless and until a

expert actually testified at trial to seek an examination of the defendant, and concluded that in light of the delays and inconvenience to the jurors and all concerned inherent in such an approach, "[t]o require the Commonwealth to wait until such a waiver occurs at trial seems not only inexpedient and unwise but also unnecessary." *Id.* at 767. The court therefore proposed a set of procedures that sought to provide the Commonwealth with an ability to obtain reciprocal discovery while respecting the defendant's self-incrimination privilege.[22] See *id.* at 757, 764, 767-769. See also *Commonwealth* v. *Baldwin*, 426 Mass. at 109-110.

(iii) Since 1979, rule 14 (b) (2) has served as the codification of the procedures set out in *Blaisdell.* Under this rule, when a defendant notifies the court that she intends to offer expert opinion testimony based on her own statements about her mental condition at the time of the crime, a judge may order her to submit to a psychiatric examination on the prosecutor's motion or the judge's order. See Mass. R. Crim. P. 14 (b) (2) (A) (iii), (b) (2) (B). The appointed examiner must file a written report containing his or her findings about the defendant's mental condition at the time of the crime. Mass. R. Crim. P. 14 (b) (2) (B) (iii). If the report contains or is based on testimonial statements of the defendant fitting within the scope of the privilege against self-incrimination, the report may not be made available to either party unless the defendant moves to make it available, or "*during trial*" the defendant raises a defense of lack of criminal responsibility and satisfies

waiver of that privilege has occurred. See *Commonwealth* v. *Goulet*, 374 Mass. 404, 411 n.4 (1978); *Commonwealth* v. *Baldwin*, 426 Mass. 105, 109 (1997), cert. denied, 525 U.S. 820 (1998). *Commonwealth* v. *Seabrooks*, 433 Mass. 439 (2001), cited by the dissent, is inapposite. *Post* at 340-341. That case involved a defendant's statements to a forensic psychologist retained by jail officials — employees of the Commonwealth — to assess the defendant's risk of suicide while he was being held in custody; the statements were contained in the jail records, and thereby available to both the prosecution and defense. See *Commonwealth* v. *Seabrooks*, *supra* at 446-447, 450-451.

[22]The dissent's discussion of *Blaisdell* erroneously suggests that the case only concerned G. L. c. 123, § 15, and had nothing to do with the issue of the Commonwealth's interest in (and need for) discovery relating to a defendant's lack of criminal responsibility defense. *Post* at 336-339. In fact, the court in *Blaisdell* indicates that through its delineation of specific procedures, it was attempting to provide a "suitable framework" that would allow necessary discovery to the Commonwealth while protecting the defendant's privilege against self-incrimination. *Blaisdell*, 372 Mass. at 757, 758, 767. See *Commonwealth* v. *Goulet*, 374 Mass. at 411 n.4.

the judge that she intends either to testify herself or call an expert witness who will testify based on her statements (emphasis added). *Id.*

As the procedures just described reflect, the scope of reciprocal discovery that rule 14 prescribes is carefully limited. When a defendant serves notice that she will call an expert witness to testify about her mental condition at the time of the crime based on her testimonial statements, the rule *only* authorizes a court-ordered psychiatric examination of the defendant by the Commonwealth's expert,[23] and nothing more.[24]

The Commonwealth responds that the limitations of rule 14 (b) (2) do not control in this case because discovery of Dr. Brown's materials was permitted by the automatic discovery provisions set out in Mass. R. Crim. P. 14 (a) (1) (A), as appearing in 442 Mass. 1518 (2004), and Mass. R. Crim. P. 14 (a) (1) (B), as amended, 444 Mass. 1501 (2005),[25] or alternatively under the discretionary discovery provisions of Mass. R. Crim. P. 14 (a) (2), as appearing in 442 Mass. 1518 (2004).[26]

---

[23]Rule 14 (b) (2) (B) provides that the court may order the defendant to submit to a psychiatric examination "upon its own motion or upon motion of the prosecutor." As a practical matter, it is the prosecutor who recommends the expert psychiatrist for appointment as the examiner. We have recognized the court-appointed examiner as an agent of the prosecution. See *Commonwealth* v. *Baldwin*, 426 Mass. at 109, citing *Blaisdell*, 372 Mass. at 760.

[24]*Blaisdell*, 372 Mass. at 766, explained the rationale for this reciprocal discovery as follows: "[A] defendant who seeks to put in issue his statements as the basis of psychiatric expert opinion in his behalf opens to the State the opportunity to rebut such testimonial evidence in essentially the same way as if he himself had testified. . . . [T]here would be no violation of [the defendant's] privilege should the court then order him . . . to submit to psychiatric examination so that the jury may have the benefit of countervailing expert views, based on similar testimonial statements of a defendant in discharging its responsibility of making a true and valid determination of the issues thus opened by [the] defendant." See *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 231 (1993).

[25]Rule 14 (a) (1) (A) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), and Mass. R. Crim. P. 14 (a) (1) (B), as amended, 444 Mass. 1501 (2005), prescribe procedures and specific types of mandatory discovery for the defendant (rule 14 [a] [1] [A]), and mandatory reciprocal discovery for the prosecution (rule 14 [a] [1] [B]).

[26]Rule 14 (a) (2) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), authorizes the defendant as well as the prosecution to move "for discovery of other material and relevant evidence" not required under the automatic discovery provisions of rule 14 (a) (1) (A) and (B).

With respect to automatic discovery, the Commonwealth points in particular to rules 14 (a) (1) (A) (vi) and (vii) — made applicable to the Commonwealth under rule 14 (a) (1) (B) — as authorizing the Commonwealth to obtain discovery of Dr. Brown's expert report as well as the results of all the psychological tests he performed. The argument fails. Rule 14 (a) (1) (A) (vi), which relates to a defendant's discovery of the prosecution's expert opinion evidence, contains an express exclusion for "evidence that pertains to the defendant's criminal responsibility that is subject to [rule 14 (b) (2)]." See Reporters' Notes to Rule 14 (a) (1) (A) (vi), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, *supra* at 1488. Rule 14 (a) (1) (A) (vii), providing for automatic discovery of, inter alia, "reports of physical examinations of any person or of scientific tests or experiments," is similarly inapplicable; neither Dr. Brown's examination of the defendant nor his psychological testing fits within the language of the rule. In any event, the dispositive point is that rule 14 (a) — both its automatic and discretionary provisions — does not apply to discovery related to the defense of criminal responsibility, because all procedures and provisions applicable to such discovery are set out in rule 14 (b) (2). See Final Submission and Report to the Supreme Judicial Court by the SJC Standing Advisory Committee on the Criminal Rules (May 9, 2003) (making recommendations for changes to rule 14 [a] and stating their inapplicability to rule 14 [b], which is "self-contained"). See also *Commonwealth* v. *Durham*, 446 Mass. 212, 221, cert. denied, 549 U.S. 855 (2006) (court is final arbiter of what rule 14 means and permits).[27]

The dissent takes a position similar to the Commonwealth's,

[27]In *Blaisdell*, 372 Mass. at 759, we carefully distinguished between a psychiatric inquiry and "[m]atters which may be relevant to a defendant's physiological condition, where objective testing devices such as X-rays, blood tests and electroencephalographs may be relevant." In *Commonwealth* v. *Trapp*, 396 Mass. 202 (1985) (*Trapp I*), S.C., 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996) (*Trapp II*), the court considered, and rejected, claims by the defendant that pretrial discovery orders requiring him to disclose to the prosecution the results of a computerized axial tomography scan and brain mapping, medical, and psychological tests violated his rights against self-incrimination. See *Trapp I*, *supra* at 212; *Trapp II*, *supra* at 363. To the extent that the *Trapp* decisions were concerned with medical or *physiological* tests, they are consistent with our decision in *Blaisdell* as well as rule 14 (b) (2) (B) (ii). However, *psychological* tests pose a different question. The first *Trapp* decision treated

but focuses on the original text of rule 14 (a),[28] rather than the version of the rule applicable to this case. The dissent argues that a judge could order, under the 1979 version of rule 14 (a) (3), "a defendant to provide the prosecution with the defense psychiatrist's expert report and statements," *post* at 339 — but only after the Commonwealth's appointed expert furnishes his or her report to the defendant under rule 14 (b) (2) (B) (iii), see *post* at 340; and that when rule 14 (a) was amended in 2004, "[t]here is no reason

these as discoverable "scientific tests," and both decisions referenced rule 14 (a) as authorizing the discovery the Commonwealth sought. Since the *Trapp* decisions, rule 14 (a) has been extensively amended and, as of the time of the pretrial proceedings in this case, no longer contained a provision for reciprocal discovery of "mental examinations of any person." To the extent that the *Trapp* decisions treat psychological tests as "scientific tests" that are subject to reciprocal discovery and, more to the point, to the extent that these cases indicate that rule 14 (a) applies to discovery related to the defense of lack of criminal responsibility, we do not continue to follow them.

[28]Rule 14 (a) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 874 (1979), provided in pertinent part:

> "(1) Mandatory Discovery for the Defendant. Upon motion of a defendant . . . the judge shall issue an order of discovery when the requested information is relevant and consists of:
>
> "(A) any written or recorded statements made by the defendant within the possession, custody, or control of the prosecutor, or
>
> "(B) the written or recorded statements of a person who has testified before a grand jury; or
>
> "(C) any facts of an exculpatory nature within the possession, custody, or control of the prosecutor. . . .
>
> "(2) Discretionary Discovery. Upon motion of a defendant . . . the judge may issue an order of discovery requiring that the defendant be permitted to discover, inspect, and copy any material and relevant evidence, documents, statements of persons, or reports of physical or mental examinations of any person or of scientific tests or experiments, within the possession, custody, or control of the prosecutor or persons under his direction and control. . . .
>
> "(3) Reciprocal Discovery. (A) *If the judge grants discovery or inspection to a defendant pursuant to subdivision (a) (2) of this rule,* the judge may upon motion by the Commonwealth condition his order by requiring the defendant to permit the Commonwealth to discover, inspect, and copy any material and relevant evidence discoverable under subdivision (a) (2) which the defendant intends to use at trial, including the names, addresses, and statements of those persons whom the defendant intends to use as witnesses at trial" (emphasis added).

to believe" the court intended to eliminate a judge's discretionary authority to order the same type of reciprocal discovery from the defendant. *Post* at 343. This reading of the original rule 14 (a) (3) and rule 14 (b) (2), however, is contrary to the plain language of each rule. Moreover, if indeed this court intended rule 14 (a) (3) to authorize a judge to issue a discovery order compelling discovery of a defense psychiatrist's materials on the defendant's receipt of the Commonwealth's expert report under rule 14 (b) (2) (B) (iii), it is reasonable to assume the text of each rule would have provided direction to that effect rather than leaving the parties, and lower court judges, blindly to navigate their way back and forth between them. The absence of any cross-reference in either rule supports our conclusion that rule 14 (b) (2), from its inception, was intended to serve as the single, self-contained, and comprehensive rule governing pretrial notice and discovery from expert witnesses concerning a lack of criminal responsibility defense.

Because rule 14 (b) (2) exclusively governs pretrial discovery relating to a lack of criminal responsibility defense, and because nothing in that rule obligates a defendant, before trial, to provide the Commonwealth's expert (see note 23, *supra*) with copies of her own expert witness's notes and other materials, we conclude that Dr. Kelly was not entitled to receive all of Dr. Brown's 200 pages of materials. In particular, he was not entitled to any of Dr. Brown's materials before trial and before he had even prepared his own report, and as to much of the materials, probably not at all.[29,30] We turn to a consideration of the consequences of the erroneous pretrial discovery orders, to which the defendant's objections were properly preserved.

(iv) The defendant argues that the error was of constitutional

---

[29]As has been indicated (see note 15, *supra*), the over 200 pages of materials that Dr. Brown was ordered to produce are not part of the record before us, with the exception of nine pages of notes. It is clear from Dr. Kelly's trial testimony that Dr. Brown's notes and materials relating to the psychological testing of the defendant were included in the total package that Dr. Kelly received. It is reasonable to assume the total package represented Dr. Brown's entire written record relating to the defendant, including, perhaps, notes of Dr. Brown's impressions of the defendant or of the case.

[30]As we discuss in Part 2.b (v), *infra*, we require, in criminal prosecutions commenced after the date of this opinion, that the defense provide the Commonwealth with a report prepared by the defendant's expert containing the expert's opinion and supporting bases and reasons.

dimension because the pretrial discovery orders violated her right against self-incrimination, and therefore we must review whether the error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Dagraca*, 447 Mass. 546, 552-553 (2006). The defendant's position finds some support in our case law. See *Commonwealth* v. *Diaz*, 431 Mass. 822, 830 n.7 (2000) (where defendant requested, and was denied, copy of appointed expert's report in violation of rule 14 [b] [2] [B] [iii], court applied harmless beyond reasonable doubt standard of review). But it is also the case that our determination of error here is based on the conclusion that the discovery orders violated a rule of criminal procedure — albeit a rule that, as *Blaisdell* makes plain, has constitutional underpinnings. Ordinarily, a preserved objection to a violation of a rule of criminal procedure would invoke the harmless error standard of review, a standard less favorable to the defendant than the harmless beyond a reasonable doubt standard. See *Commonwealth* v. *Perez*, 411 Mass. 249, 260 n.8 (1991), citing *Kotteakos* v. *United States*, 328 U.S. 750, 764-765 (1946).

We need not resolve which standard of review applies, because even if we apply the less stringent standard of harmless error, we cannot say that the discovery orders were nonprejudicial and therefore harmless. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). The error went beyond a simple timing issue. Dr. Kelly's initial report indicates that he not only received and reviewed all the materials ordered produced by Dr. Brown — which included, among other things, Dr. Brown's notes of the defendant's statements reflecting her "alleged memory of incident," and his psychological testing materials — but also relied on those materials, among other sources, to form his own opinion of the defendant's criminal responsibility. At trial, Dr. Kelly repeated the point. He testified that he received and reviewed all the materials supplied by Dr. Brown before writing his reports in this case; and he identified specifically his review of Dr. Brown's notes as one of the foundational reasons supporting his opinion that the defendant was criminally responsible.

Where a defendant's criminal responsibility vel non is the central issue, and where each side produces one expert witness to testify concerning the defendant's mental state, an expert's opinion may have extreme significance. Here, the over-all strength of the

Commonwealth's case relied heavily on Dr. Kelly's testimony that the defendant did not meet the legal standard required for lack of criminal responsibility. However, that opinion and testimony was based on a review of a large quantity of materials that were erroneously provided to Dr. Kelly.[31] In the circumstances, we cannot say we are "sure that the error [relating to the discovery order that allowed Dr. Kelly to base his expert opinion of criminal responsibility on materials, which included statements of the defendant, that he should not have been able to review] did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. at 353, quoting *Commonwealth* v. *Peruzzi,*

---

[31]The dissent contends that the only error in this case concerns the timing of disclosure but not its substance. See *post* at 334-335. That is not the case. As we state in this opinion, in the future, a report prepared by a defendant's psychiatric expert witness *shall* be provided to the Commonwealth at the appropriate time — as indeed was done in the present case. (On this point, the dissent takes pains to catalogue in detail all the ways in which it finds Dr. Brown's report to be deficient, see *post* at 331-332, but of course if a party claims a report received from the other side's expert is inadequate, the party may request, and a judge may order, the report to be supplemented.) But we do not accept the dissent's core premise that as a general matter, all notes prepared by a defendant's psychiatric expert witness — whether notes on interviews with or testing of the defendant or other topics — should be available to the Commonwealth at some time before or during trial as a matter of course. This is not even the approach taken with respect to expert witness discovery in civil cases. See Mass. R. Civ. P. 26 (b) (4), 365 Mass. 772 (1974). Beyond that, we have questions relating to discovery of results of psychological tests performed by the defendant's own psychiatric expert. Under rule 14 (b) (2) (B), as currently in effect, there is no provision for pretrial discovery by the Commonwealth of psychological test results and materials prepared by the defendant's expert; rather, the rule specifically provides that the Commonwealth's expert may perform his or her own psychological testing of the defendant. See Mass. R. Crim. P. 14 (b) (2) (B) (i). Although we recognize that there may be cases in which the Commonwealth and the defendant agree to exchange or provide such test results to each other, because there was no such agreement in this case, it was error for the judge to order the defendant to turn over to the Commonwealth's expert the results, notes, and materials concerning the psychological tests performed by Dr. Brown. Whether this aspect of rule 14 (b) (2) should be modified in any respect in the future is an issue we ask the standing advisory committee on the rules of criminal procedure to consider. See Part 2.b (v), *infra.* Finally, it is important to emphasize that the only issue we address in this case is *pretrial* discovery. If, as the dissent fears, a defendant's expert psychiatric witness is "cherry-picking" the defendant's statements at *trial,* see *post* at 332-333, a trial judge has discretion to entertain remedial measures, which may include the required disclosure to the prosecution of any notes the defendant's expert may have on the substance of the defendant's statements to the expert.

15 Mass. App. Ct. 437, 445 (1983). Contrast *Commonwealth* v. *Stroyny*, 435 Mass. 635, 645-646 (2002) (no prejudice to defendant where court-appointed expert improperly revealed some of defendant's statements to prosecutor before trial, as statements had been "brought out" by defendant during his direct testimony and prosecutor's use of statements at trial could have been based on defendant's own trial testimony rather than earlier disclosure by expert); *Commonwealth* v. *Diaz*, 431 Mass. at 830 n.7 (error in denying defendant's request for copy of appointed expert's report was harmless beyond reasonable doubt because appointed expert did not testify and his report was neither admitted in evidence nor used by prosecutor).[32] Accordingly, reversal of the defendant's conviction is required.[33]

(v) The Commonwealth asks that we clarify what it describes as "confusion" surrounding the sequence of production of mental health experts' materials. We offer the following.

In the time since we decided *Blaisdell* and adopted rule 14 (b) (2), there has been a general liberalization of discovery in criminal cases designed to minimize surprise at trial, although discovery is, of course, carefully circumscribed to protect a defendant's rights. See, e.g., *Commonwealth* v. *Durham*, 446 Mass. at 228; *Commonwealth* v. *Paszko*, 391 Mass. 164, 187-188 (1984); *Commonwealth* v. *Gilbert*, 377 Mass. 887, 893 (1979). See generally Skeels, The Rules of Criminal Procedure and the 30-Year Experiment with Discovery in Criminal Cases, 92 Mass. L. Rev. 142 (2009).

Our application of the *Blaisdell* procedures in several contexts

---

[32]In light of this conclusion, we do not need to address whether there was additional error in either the judge's February 16, 2006, order allowing Dr. Kelly to discuss with the Commonwealth the statements of the defendant contained in Dr. Brown's materials or the Commonwealth's use of those materials throughout the defendant's trial.

[33]If, in connection with any retrial of this case, the defendant proceeds with a lack of criminal responsibility defense based on her statements, the Commonwealth will need to seek appointment of a new psychiatric expert. If the defendant does so proceed and provides notice that she expects to call Dr. Brown as an expert witness to testify at trial, the Commonwealth may not provide Dr. Brown's expert report currently in its possession to any newly appointed psychiatric expert witness until the judge's release to the defense of the report prepared by the Commonwealth's expert, unless the defendant and the Commonwealth agree on an earlier time.

beyond criminal responsibility, see note 19, *supra*, reflects our view, in line with the trend of increased discovery in criminal cases, that the Commonwealth should have advance notice of complex mental health issues that the defendant intends to raise as part of his or her defense. See *Commonwealth* v. *Diaz*, 431 Mass. at 830, quoting *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 231 (1993) (reciprocal discovery of psychiatric defenses "promotes 'society's conduct of a fair inquiry' "). Consistent with this trend toward mutual disclosure, as indicated earlier (see note 30, *supra*), it is appropriate to modify, for criminal cases commenced after the date of this opinion, the procedures set out in rule 14 (b) (2) to require the defendant's expert to produce to the prosecution a report that includes the defense expert's opinion and the bases and reasons for this opinion.[34,35] We request this court's standing advisory committee on the rules of criminal procedure — which currently has under consideration amendments to rule 14 (b) (2) unrelated to this matter — to propose an amendment to rule 14 (b) (2) that will reflect this determination, and that will address the appropriate time that such production should take place.[36] Additionally, the

---

[34]It appears that mutual disclosure of experts' reports is not uncommon. See, e.g., *Commonwealth* v. *Baldwin*, 426 Mass. at 109 n.3 (defendant assented to Commonwealth's motion for production and disclosure of reports by Commonwealth's expert and defendant's two testifying expert witnesses); *Commonwealth* v. *Harvey*, 397 Mass. 803, 805 (1986) (simultaneously with court's releasing to parties report of appointed expert, defense counsel gave prosecutor copy of report prepared by psychiatrist retained by defendant). We do not suggest that an agreement, or lack of objection, by a defendant's counsel to the exchange of psychiatric experts' reports or other information before any amendment to rule 14 (b) (2) would have been, or would be, inappropriate or improper.

[35]Under the Federal Rules of Criminal Procedure, in a case where the defendant asserts a defense of lack of criminal responsibility, on request, both the prosecution and the defendant must produce a written summary of expert testimony that each intends to use; the summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. See 18 U.S.C. § 4247(c) (2006); Fed. R. Crim P. 12.2 (b) and (c); Fed. R. Crim P. 16 (a) (1) (F) & (G) and (b) (1) (B) & (C). See generally *United States* v. *Rettenberger*, 344 F.3d 702, 706 (7th Cir. 2003).

[36]Pending our receipt and consideration of the standing advisory committee's recommendation, a defense expert's report should be made available to the Commonwealth at the time that the judge releases the court-appointed expert's report pursuant to rule 14 (b) (2) (B) (iii), unless the parties agree to an earlier time.

standing advisory committee is directed to consider whether, and if so when and in what form, an expert's psychological testing materials, if any, should be included in this mutual disclosure, cf. Fed. R. Crim. P. 16 (b) (1) (B); and study the appropriateness of including in rule 14 (b) (2) a discretionary discovery provision similar to that in rule 14 (a) (2).

c. *Other issues.* We consider certain additional issues that may arise at a retrial.

(i) Daubert-Lanigan *hearing.* On the first day of trial, the defendant filed a written motion to hold a hearing on the scientific reliability and admissibility of Dr. Kelly's testimony pursuant to *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994) (*Lanigan*) (*Daubert-Lanigan* hearing). The judge heard some argument by counsel on the motion, but declined to hold an evidentiary hearing and ultimately denied the motion.[37] During trial but before Dr. Kelly testified, the defendant renewed her motion for a *Daubert-Lanigan* hearing. The judge again denied the request.[38]

---

[37]In denying the defendant's motion, the judge stated:

"I'm going to deny that motion. It seems to me to be beyond challenge that what I regard as the soft science of diagnosing mental illness, particularly whether the — a defendant suffers a mental disease or defect with the consequent effect on the criminal responsibility at a historical point in time, is an issue that has been so regularly confronted by the appellate courts with a long acceptance of this testimony in our jurisprudence that there is not a justification for *Daubert-Lanigan* hearing.

"Appreciating the deficiencies of Doctor Kelly's report, I still think that it is reasonable, under the circumstances as I understand them, as well as under the case law, that personal observations, as he has reported having during his examination of the defendant, and his clinical experience are or may be, depending on the jury's view, reliable methodology, but are reliable, from my judicial perspective, to justify his offering opinions on that topic. So, I'm going to deny that motion."

[38]The judge stated, "I'm going to deny that request. I think as I said several days ago in this soft science area, I don't believe that a [*Daubert-Lanigan*] hearing is required. I have to observe that Doctor Kelly appears in reported decisions for many many years offering similar opinions as he is going to articulate here, and I think I've even read several opinions in which he testified that he felt that a particular defendant did lack criminal responsibility. So I'm going to deny the request or deny the motion and allow his testimony — for a [*Daubert-Lanigan*] hearing."

On appeal, the defendant challenges the judge's refusal to hold the requested hearing on the reliability of Dr. Kelly's testimony.

In *Lanigan, supra* at 26, the court determined that the standard for admitting scientific expert evidence could be satisfied by the general acceptance standard, see *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923), or by demonstrating the reliability or validity of the underlying theory or process by some other means. In *Canavan's Case*, 432 Mass. 304 (2000), we made clear that expert testimony based on personal observations or the expert's clinical experience were not exempt from the requirements of *Lanigan*. See *id.* at 313 ("Observation informed by experience is but one scientific technique that is no less susceptible to *Lanigan* analysis than other types of scientific methodology"). The defendant, therefore, is correct that a so-called "soft science," such as psychiatry, in which expert opinions are often based on the personal observations and clinical experience of the psychiatrist, fall within *Lanigan's* reach. We do not, however, understand the judge to have refused to hold an evidentiary *Daubert-Lanigan* hearing on the ground that psychiatry, as a "soft science," was exempt from such an analysis.

The fact that it may be necessary for a judge — at least on motion of one of the parties — to determine whether the opinion testimony of a particular expert witness is sufficiently reliable to be presented at trial does not mean the judge must hold a separate evidentiary hearing. Rather, we have held that a *Daubert-Lanigan* hearing may not be necessary where the expert's methodology has previously been accepted as reliable in the relevant field.[39] See *Commonwealth* v. *Shanley*, 455 Mass. 752, 763 n.15 (2010); *Commonwealth* v. *Frangipane*, 433 Mass. 527, 538 (2001). At the time of the defendant's trial, Dr. Kelly had testified as a mental health expert in one hundred to 200 cases in Massachusetts. In addition, Dr. Kelly's opinion testimony was based on his interview with the defendant, see, e.g., *Blaisdell*, 372 Mass. at 759 ("The primary diagnostic source in [psychiatric examinations] is that which the examiner may glean

---

[39]This does not preclude a party from requesting a hearing on the belief that the science in a particular field has advanced to the point where previously accepted expert testimony would no longer be considered reliable. See *Commonwealth* v. *Shanley*, 455 Mass. 752, 763 n.15 (2010); *Commonwealth* v. *Murphy*, 59 Mass. App. Ct. 571, 576 n.6 (2003).

from the nature and content of the defendant's statements"), and he reviewed a wide variety of materials related to her personal and medical history (including mental health history) as well as the circumstances of the crime with which she was charged. On this record, we conclude that the judge, who was permitted to consider each of these factors, see *Commonwealth* v. *Goodman*, 54 Mass. App. Ct. 385, 391 (2002), was within his discretion to find that Dr. Kelly's methodology was "reliable to support [his] scientific conclusion," *Canavan's Case*, 432 Mass. at 314,[40] and to permit him to testify without holding an evidentiary hearing.[41]

(ii) *Jury instruction.* The defendant argues it was error for the judge to refuse to provide a definition of "mental disease or defect" in the jury charge. We have previously indicated that a judge is not required to define "mental disease or defect" but has discretion to provide the instructions that are appropriate to the context. *Commonwealth* v. *Fuller*, 421 Mass. 400, 411 (1995). Although a definition beyond that contained in the model instruction may have been helpful here, see *Commonwealth* v. *Mills*, 400 Mass. 626, 635 n.2 (1987) (O'Connor, J., dissenting) ("Definition of the words 'mental disease or defect' by this court would benefit the administration of justice"), we cannot say there was an abuse of discretion.

---

[40]The defendant's specific criticisms of Dr. Kelly — that he conducted only "one unstructured interview," formed an opinion on mental status without regard to standardized criteria established in the Diagnostic and Statistical Manual of Mental Disorders, and supports a view that only psychosis constitutes a mental disease or defect that makes a defendant unable to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law — did not and do not make his testimony inadmissible. Rather, these objections represented proper grounds for cross-examination. See *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). See also *Commonwealth* v. *Sands*, 424 Mass. 184, 186 (1997).

[41]The burden is on the proponent of the expert testimony to show that the method of personal observation employed in the case is reliable. *Canavan's Case*, 432 Mass. 304, 314 (2000). The defendant argues that the Commonwealth made no such showing because no written opposition or documents were filed after the defense filed its motion requesting a *Daubert-Lanigan* hearing. However, the Commonwealth met its burden during the arguments heard on February 13, 2006 (following jury empanelment), when the judge required the Commonwealth to detail why Dr. Kelly's interview methodology and expected testimony were reliable.

(iii) *Recording of Dr. Kelly's interview.* In a pretrial motion, the defendant requested that "a full video and audio record" be made of Dr. Kelly's examination of the defendant. The motion judge, relying on an affidavit submitted by Dr. Kelly in which he opined that recorded sessions result in less spontaneity on behalf of the defendant, denied the request. We have previously recognized that videotaping the appointed examiner's psychiatric interview "might be a sound idea," *Commonwealth* v. *Trapp*, 423 Mass. 356, 359, cert. denied, 519 U.S. 1045 (1996); see *Commonwealth* v. *Baldwin*, 426 Mass. at 111, and we continue to do so. However, contrary to the defendant's claim, we can find no abuse of discretion by the judge in this case. See *Commonwealth* v. *Lo*, 428 Mass. 45, 48 (1998).

(iv) *Evidentiary rulings.* We briefly address three evidentiary rulings by the judge. The first concerns the testimony of attorney Kathryn Parakilas. Parakilas had been the defendant's attorney for ten years before July 28, 2004, the date of the homicide, and was at that time providing representation in connection with her divorce. The defendant called Parakilas as a witness at trial for the purpose of introducing in evidence the original of a letter written by the victim that accused the defendant of hiding her own purse, reporting it stolen to the police, and filing a false insurance claim. On cross-examination, Parakilas testified that she had represented the defendant at her arraignment on the murder charge in the District Court on the July 30, 2004, and, over objection, she testified that she knew at that time that the court could order a psychiatric examination but did not request one. The defendant argues that this testimony violated the attorney-client privilege. We agree.

Just as an attorney's mental impressions concerning her client's truthfulness are subject to the attorney-client privilege, see *Commonwealth* v. *Martinez*, 425 Mass. 382, 391 (1997), so too are the attorney's mental impressions about her client's sanity. By inquiring into Parakilas's decision not to request a psychiatric examination on the date of the defendant's arraignment, the Commonwealth impermissibly intruded into Parakilas's impressions of her client's mental state. Such testimony should not have been admitted.

Second, the defendant argues it was error for the judge to sustain an objection to Dr. Brown's testimony concerning his

explanation of how the victim's thirty-four stab wounds bore on his diagnosis that the defendant suffered from dissociative disorder not otherwise specified. The basis of the judge's ruling is not clear from the record, but as a general matter, the defendant's expert in a criminal responsibility case is entitled to testify broadly about mental capacity. *Commonwealth* v. *Louraine*, 390 Mass. 28, 34 (1983) ("A defendant is entitled to place before the jury any evidence which is at all probative of his mental condition"); *Commonwealth* v. *Callahan*, 386 Mass. 784, 792 (1982), quoting *Commonwealth* v. *McHoul*, 352 Mass. 544, 550 (1967) ("Experts experienced in the study and treatment of the mentally ill may testify fully as to the nature and extent of impairment of defendants' mental faculties as well as their observations or other bases for their conclusions"). To the extent that Dr. Brown sought to render an opinion that the evidence of thirty-four stab wounds — evidence introduced by the Commonwealth as part of its case-in-chief — supported his view that the defendant was experiencing a dissociative mental state, that testimony would appear to fall within permissible bounds.

Finally, the defendant is correct that it was error for the prosecutor, as part of the Commonwealth's case-in-chief, to ask three lay witnesses whether the defendant ever showed "overt signs of a mental illness."[42] These witnesses were not qualified to give such an opinion. See, e.g., *Commonwealth* v. *Bruno*, 432 Mass. 489, 511 (2000); *Commonwealth* v. *Monico*, 396 Mass. 793, 803 (1986). See also Mass G. Evid. §§ 701, 702 (2010).[43]

3. *Conclusion.* The defendant's conviction is reversed, the

---

[42]Each witness answered the question in the negative, and the prosecutor used these responses in the Commonwealth's closing argument, stating, "None of the people who knew her described her as exhibiting any signs of a serious mental illness."

[43]Although a lay witness may not testify about whether another person suffered from mental illness, such a witness is permitted to "testify to facts observed." *Commonwealth* v. *Monico*, 396 Mass. 793, 803 (1986). In this case, after replying in the negative to whether the defendant exhibited "overt signs of a mental illness," the victim's daughter, Michele Battista, testified that she (Battista) did not have difficulty understanding the defendant; that the defendant never appeared to have difficulty understanding her; that the defendant's speech was lucid and coherent; and that the defendant was able to successfully manage everyday affairs, such as owning and driving a car. Two friends of the defendant provided similar testimony. These observations were properly admitted, as they represented "summary descriptions . . . based on

verdict set aside, and the case remanded to the Superior Court for a new trial.

*So ordered.*

GANTS, J. (dissenting, with whom Cowin, J., joins). I agree with the court that a Superior Court judge and the single justice erred in ordering *pretrial* disclosure to the Commonwealth's expert witness, Dr. Martin Kelly, of the interview notes and psychological test results prepared by Dr. Daniel Brown, the licensed forensic psychologist retained by the defendant as an expert witness as to the defendant's lack of criminal responsibility. I also agree with the court that, after defense counsel said in his opening statement that he would offer the expert testimony of Dr. Brown and after Dr. Kelly's expert report was provided to the defendant, the judge properly ordered disclosure of Dr. Brown's expert report to Dr. Kelly and the prosecution.

I dissent on three grounds. First, I do not agree that, in view of the testimony offered on direct examination at trial by Dr. Brown, it would have been error for the trial judge, before cross-examination, to have ordered disclosure to Dr. Kelly and the prosecution of the over 200 pages of interview notes and psychological testing materials on which Dr. Brown relied in proffering his opinion. Dr. Brown's expert report described the documents he reviewed and the date and length of his interviews with the defendant, listed the psychiatric conditions from which he concluded the defendant suffered,[1] and stated his ultimate opinion that "those conditions, in combination, caused [the defendant] to lack substantial capacity to appreciate the wrongfulness or criminality of her conduct, and resulted in her having a

---

the sensory reactions of [a person] . . . and [did] not [require] special learning or experiment." *Commonwealth* v. *Brusgulis*, 41 Mass. App. Ct. 386, 390-391 (1996), quoting *Commonwealth* v. *Tracy*, 349 Mass. 87, 95 (1965).

[1]Dr. Brown's report concluded that on the date of the killing, the defendant suffered from (1) major depressive disorder; (2) posttraumatic stress disorder; (3) panic disorder; (4) axis II personality disorder (mixed with primary dependent personality disorder); and (5) major dissociative disorder (dissociative amnesia and dissociative disorder not otherwise specified). The report stated that each diagnosis was based on the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2004).

lack of substantial capacity to conform her conduct to the requirements of the law on July 28, 2004." His report did not state a single fact on which he based his psychiatric diagnosis or his opinion, and did not provide a summary of the grounds for his opinion.[2] Nor did his report identify any statement made by the defendant during their interviews or any test result that supported his psychiatric diagnosis or opinion. However, during his direct examination, Dr. Brown read verbatim statements of the defendant from his interview notes and testified in detail about the results of eleven different psychological tests given to the defendant.

Without access to the interview notes and the test results, the prosecution could not know whether the rule of completeness was satisfied when Dr. Brown read selected portions of the defendant's statements made to him during their interviews, whether Dr. Brown had "cherry picked" the statements he had chosen to read from his notes or read them out of context, or whether the psychological test results were fairly and accurately characterized to the jury. The court concedes that, if "a defendant's expert psychiatric witness is 'cherry picking' the defendant's statements at *trial*, . . . a trial judge has discretion to entertain remedial measures, which may include the required disclosure to the prosecution of any notes the defendant's expert may have on the substance of the defendant's statements to the expert" (emphasis in original). *Ante* at 323 n.31. Of course, the flaw in this reasoning is that a trial judge will not know that the witness is "cherry picking" unless the opposing attorney demonstrates the unfair selectivity, and the opposing attorney will not be able to demonstrate the unfair selectivity unless she has access to all the expert's notes regarding the substance of the defendant's statements to the expert, which the court's decision today precludes.

In fact, the record at trial in this case shows that, when Dr. Brown testified on direct examination, he did "cherry pick" certain statements from what the defendant had told him in their

---

[2]If Dr. Brown had been an expert witness in a civil case, and answered expert interrogatories without stating a single fact on which he based his psychiatric diagnosis or his opinion, or providing a summary of the grounds for his opinion, the opposing party could justly have moved for and obtained an order compelling further answers to these interrogatories to comply with the requirements in Mass. R. Civ. P. 26 (b) (4) (A), 365 Mass. 772 (1974).

interviews. Dr. Brown testified on direct examination that, when he first began interviewing the defendant, she had no memory at all of the events that occurred on the day she killed her husband. He said that he conducted a test for "memory malingering," and that she did not respond on the test "like a person trying [to] fake loss of memory." He later testified:

> "During her dissociative state, she had substantial loss of awareness. She . . . she wouldn't see anything. She . . . could hear no sounds. She could still feel bodily sensations during the report of a struggle with her husband, but there was no awareness of normal sensory perceptions. She couldn't see the environment. She couldn't hear anything for a substantial period of time. There was substantial time loss. And she wasn't aware of actions; for example, she talked about having blood on her, but she wasn't aware of how it got there."

While this testimony reasonably would have left the jury with the impression that the defendant had virtually no memory of the day of the killing, Dr. Brown's notes reflect that the defendant recalled a great deal about that day — that she woke up that morning wanting to kill herself, picked up a paring knife from the kitchen counter, and put the knife to her throat but ultimately pulled back from slitting her throat; that she grabbed a larger kitchen knife from the knife holder, went to the bedroom where her husband lay sleeping, and saw her husband jump at her when he saw that she was going to hurt herself; that a struggle ensued in which she felt pain as her husband tried to get something away from her and that he pushed, pulled, and kicked her; that she heard her husband make a sound after the struggle stopped, like someone vomiting; that when the struggle ended, she saw her husband lying motionless on the floor and "something red" on the floor and on her arms and hands; and that she then washed the blood from her arms and hands and covered his body with a sheet from the linen closet. Therefore, if in the court's view there must be evidence of "cherry picking" to justify disclosure to the prosecution of the interview notes of the defendant's expert witness, there is abundant evidence here.

As to the psychological test results, the court takes no position whether they were discoverable, inviting the court's standing advisory committee on the criminal rules to consider the

question. See *ante* at 323 n.31 & 325-326. As a result, the court cannot conclude that it would have been error for those test results to have been disclosed to Dr. Kelly and the prosecution after the defendant's opening statement in this case. The importance of and justification for such disclosure is demonstrated by the trial record in this case, where Dr. Kelly in his rebuttal testimony disputed whether Dr. Brown had fairly and accurately interpreted the psychological test results that, according to Dr. Brown's testimony, constituted the most significant evidence for his determination that on the day of the killing the defendant was unable to appreciate the wrongfulness of her conduct.

Second, where the only error concerns the timing of disclosure to the prosecution of the interview notes and psychological test results, not the substance of disclosure, I do not agree that this error of timing resulted in prejudicial error. The court, while effectively admitting to the possibility that disclosure of Dr. Brown's interview notes and test results may have been permissible, appears to conclude that prejudicial error resulted from the premature disclosure of these materials to Dr. Kelly (but not the prosecutor) on January 27 and, subsequently, to the prosecution on February 16,[3] rather than following Dr. Brown's direct testimony on February 22. This premature disclosure could only have resulted in prejudice to the defendant if the prosecutor's cross-examination of Dr. Brown or Dr. Kelly's rebuttal testimony would have been materially different (and less persuasive to the jury) had they first received the interview notes and psychological test results following Dr. Brown's direct testimony on February 22. There is no reason to believe that such prejudice occurred.

If the disclosure of Dr. Brown's materials on February 22, after his direct examination, had denied the prosecutor or Dr. Kelly a fair opportunity to read and consider the interview notes and psychological test results before undertaking cross-examination of Dr. Brown or direct examination of Dr. Kelly, we would expect the judge to have granted the Commonwealth a continuance to give the prosecutor and Dr. Kelly that fair opportunity. The court's reversal of the defendant's conviction here rests on a conclusion that, if the judge had permitted disclosure of Dr. Brown's interview notes and psychological

---

[3]The judge permitted Dr. Kelly to share this information with the prosecutor after the defendant's opening statement on February 16, 2006.

test results only after Dr. Brown's direct testimony, the defendant would have benefited because the prosecutor would have had too little time to employ the materials effectively on cross-examination of Dr. Brown, and Dr. Kelly would have had too little time to use them thoughtfully in formulating his opinions. To put it bluntly, in the court's view, the prejudice that resulted from early disclosure is that the Commonwealth was able to make too effective use of information to which it was entitled. I know of no other conviction reversed on so meager a foundation.[4]

My third ground of disagreement with the court concerns the circumstances under which, following Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004), and as amended, 444 Mass. 1501 (2005), a judge may order disclosure of a defense expert's interview notes and psychological test results to the prosecution. I conclude that a defense expert's interview notes and psychological test results, like a defense expert's report, are subject to reciprocal discovery after the Commonwealth's expert report, interview notes, and psychological test results are provided to the defendant and after defense counsel in opening statement commits to present the opinion of the defendant's expert, where that opinion rests in whole or in part on the defendant's statements to the expert.[5]

To explain why I differ with the court, I need to examine the

---

[4]I know of no authority to support a conclusion that premature disclosure to the Commonwealth of reciprocal discovery to which the prosecution is entitled results in prejudicial error. We have, however, frequently held that *late* disclosure to a *defendant* of exculpatory or other evidence to which the defendant is entitled did not result in prejudicial error. See *Commonwealth* v. *Baldwin,* 385 Mass. 165, 175-176 (1982) (exculpatory evidence); *Commonwealth* v. *Gilbert,* 377 Mass. 887, 894-895 & n.7 (1979) (incriminating prior statements of prosecution witness). In reviewing this sort of error, "it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case.' " *Commonwealth* v. *Baldwin, supra* at 175, quoting *Commonwealth* v. *Wilson,* 381 Mass. 90, 114 (1980). In such circumstances, a delay results in prejudice only if, after considering the entire record, we conclude that "given a timely disclosure, the defense would have been able to prepare and present its case in such a manner as to create a reasonable doubt that would not otherwise have existed." *Commonwealth* v. *Baldwin, supra,* quoting *Commonwealth* v. *Wilson, supra.*

[5]I agree with the court's suggestion that these issues should be addressed by the court's standing advisory committee on the criminal rules.

evolution of our law of discovery in the context of a criminal defendant's claim of lack of criminal responsibility. For all practical purposes, that history began in 1977, when we considered the case of Blaisdell v. Commonwealth, 372 Mass. 753 (1977) (Blaisdell). In that case, after the defendant had filed a written statement declaring his intention to present a defense based on lack of criminal responsibility, the judge allowed the Commonwealth's motion directing the defendant to submit to psychiatric examination by an expert selected by the Commonwealth, and ruled that, if the defendant refused to cooperate in the examination, he would be foreclosed from raising an insanity defense at trial. Id. at 754. In issuing this order, the judge relied on G. L. c. 123, § 15 (a), which authorizes a judge in a criminal case to order an examination of a defendant by a qualified physician or psychologist if the judge doubts whether the defendant is criminally responsible due to mental illness or mental defect.[6] Blaisdell, supra at 754-755. The defendant petitioned this court for relief from the judge's order under G. L. c. 211, § 3, and a single justice reserved and reported two questions to the full court: (1) may a defendant who discloses that he intends to interpose a defense of insanity at trial and who has sought no discovery from the Commonwealth be foreclosed from presenting expert psychiatric testimony at trial if he refuses to cooperate at a court-ordered psychiatric examination to determine criminal responsibility, and (2) if the defendant cooperates with the court-ordered psychiatric examination, to what extent may a report or the testimony of the examining psychiatrist be used at trial? Blaisdell, supra at 755 & n.1.

In answering the first question in the affirmative, we interpreted G. L. c. 123, § 15 (a), to avoid conflict with a defendant's constitutional privilege against compelled self-incrimination when the defendant has given notice of his intention to introduce the testimony of a psychiatrist to support a defense of lack of criminal responsibility. Blaisdell, supra at 757-766. The court declared:

"If . . . a defendant voluntarily submits to psychiatric

---

[6]The relevant provisions of G. L. c. 123, § 15 (a), have not changed since our decision in Blaisdell v. Commonwealth, 372 Mass. 753 (1977) (Blaisdell). Compare St. 1971, c. 760, § 12, with St. 1986, c. 599, § 38.

interrogation as to his inner thoughts, the alleged crime and other relevant factors bearing on his mental responsibility and, on advice of counsel, voluntarily proffers such evidence to the jury, we feel that the offer of such expert testimony based in whole or in part on a defendant's testimonial statements constitutes a waiver of the privilege for such purposes. . . . [A] defendant who seeks to put in issue his statements as the basis of psychiatric expert opinion in his behalf opens to the State the opportunity to rebut such testimonial evidence in essentially the same way as if he himself had testified."

*Id.* at 766. Because the defendant's proffer of an expert opinion at trial by a defense psychiatrist[7] based, at least in part, on information provided by the defendant, constituted a waiver of the defendant's constitutional privilege against self-incrimination, this privilege was not violated by an order compelling the defendant to submit to an examination by the prosecution's psychiatrist.[8] *Id.*

Our decision in *Blaisdell*, however, did not require the Commonwealth to wait until the defendant's psychiatric expert had testified at trial before permitting its expert to interview the defendant. Such a rule, we concluded, would be unsatisfactory because it would either necessitate a continuance of the trial or leave too little time for a prosecution expert to examine the defendant and formulate an informed opinion as to criminal responsibility. *Id.* at 767. Instead, we held that, when a defendant declares his intent to offer expert testimony in support of his defense of lack of criminal responsibility and further declares that the testifying expert will rely in whole or in part on the defendant's own statements regarding his mental state at or about the time of the commission of the alleged crime, the

---

[7]I refer to a psychiatrist, but an expert opinion of a psychologist or clinical social worker would be treated identically.

[8]In *Commonwealth* v. *Callahan*, 386 Mass. 784, 789 (1982) (*Callahan*), we clarified that the "defendant, by voluntarily proffering such evidence to the jury, has waived his privilege against self-incrimination to a limited extent," recognizing that the limitations on the use of the defendant's compelled interview required by G. L. c. 233, § 23B, would apply. Under § 23B, no statement made by a defendant during a compelled psychiatric examination may be admissible in evidence against him on any issue other than the defendant's mental condition, and may not be admissible even for that limited purpose "if such statement constitutes a confession of guilt of the crime charged."

judge may order the defendant to submit to a pretrial psychiatric examination pursuant to G. L. c. 123, § 15, provided the judge also issues a protective order declaring, inter alia:

> "The experts conducting the examination ordered by the court may not reveal to the prosecution or anyone acting in its behalf any evidence, statements, confessions or admissions obtained from the defendant except evidence derived from solely physical or physiological observation or tests, except as ordered by the court"; and

> "Psychiatrists who conduct the examination ordered by the court shall file a written report of their findings with the court including a specific statement of what the basis of such findings may be, and such report shall not be available to either prosecution or defense unless, on inquiry by the court, the court determines that it does not contain any matter, information or evidence based on the defendant's testimonial statements. . . . If the report contains matter within the scope of the privilege, it shall be sealed and shall not be available to either party until such time during the course of the trial as the defendant raises the issue of insanity and makes clear to the court his intent either (a) to testify in his own behalf or (b) to place in evidence the testimony of psychiatric witnesses whose testimony will be based in whole or in part on the defendant's extrajudicial or judicial statements."

*Id.* at 768.

Under such a protective order, if before trial a defendant reconsiders his trial strategy and decides not to proceed with an insanity defense or not to call to testify any expert witness who has based his opinion on an interview of the defendant (thereby preserving his privilege against self-incrimination), the defendant's and the prosecution's interests are both protected: the testimonial fruits of the defendant's compelled interview with the government's expert will be unavailable for use against the defendant, directly or indirectly, and the information developed during the court-ordered examination will not taint the Commonwealth's case. *Id.* at 762, and cases cited.

Because the issue presented to us in *Blaisdell* only concerned the application of G. L. c. 123, § 15 (*a*), we had no occasion

there to address in what circumstances, if any, the Commonwealth could obtain discovery of an expert report or other material prepared by the defendant's psychiatrist. We first addressed that issue in 1979, when we promulgated the rules of criminal procedure. Pretrial discovery was governed by Mass. R. Crim. P. 14, 378 Mass. 874 (1979). Under rule 14 (a) (1), which instituted mandatory, pretrial discovery for the defendant, on motion of the defendant a judge was required to order discovery of the defendant's written or recorded statements, any written or recorded grand jury testimony, and any exculpatory facts within the custody or control of the Commonwealth. Rule 14 (a) (2) gave a judge discretion to order other discovery for the defendant, including "statements of persons, or reports of physical or mental examinations of any person or of scientific tests or experiments" within the prosecutor's custody or control. Rule 14 (a) (3) provided for limited reciprocal discovery. If a judge had ordered discretionary discovery for the defendant under rule 14 (a) (2), on motion of the Commonwealth, the judge could require the defendant to provide reciprocal discovery to the prosecution of information discoverable under rule 14 (a) (2), including reports of mental examination and "statements of those persons whom the defendant intends to use as witnesses at trial."[9] Mass. R. Crim. P. 14 (a) (3). See *Commonwealth* v. *Paszko*, 391 Mass. 164, 187 (1984). Therefore, under rule 14 (a) (3), a judge could order a defendant to provide the prosecution with the defense psychiatrist's expert report and statements, but only if the defendant intended to call the psychiatrist as a witness at trial and only after the prosecution had provided to the defendant the report and statements of the psychiatrist it intended to call in rebuttal.

Rule 14 (b) (2) addressed the Commonwealth's examination

---

[9]The relevant reciprocal discovery language of Mass. R. Crim. P. 14 (a) (3), 378 Mass. 874 (1979), provided:

"(A) If the judge grants discovery or inspection to a defendant pursuant to subdivision (a) (2) of this rule, the judge may upon motion by the Commonwealth condition his order by requiring the defendant to permit the Commonwealth to discover, inspect, and copy any material and relevant evidence discoverable under subdivision (a) (2) which the defendant intends to use at trial, including the names, addresses, and statements of those persons whom the defendant intends to use as witnesses at trial."

of a defendant raising a defense of lack of criminal responsibility. Because rule 14 (b) (2) adopted the procedures established in *Blaisdell* to govern a compelled psychiatric examination of the defendant by the prosecution's examiner, if the examiner's report contained any information or evidence based on statements of the defendant as to his mental condition or criminal responsibility, a defendant could not be obligated to provide reciprocal discovery regarding his expert's opinion until a judge had first unsealed the prosecution's examiner's report and made it available to the defendant. See Mass. R. Crim. P. 14 (a) (3) and (b) (2). Rule 14 (b) (2) did not permit a judge to release the examiner's report until the defendant raised the defense of lack of criminal responsibility at trial and the judge was satisfied that the defendant intended either to testify in his own behalf or to offer expert testimony based in whole or in part on the defendant's statements as to his mental condition or criminal responsibility. If the prosecution's examiner's report did not contain any information or evidence that was based on statements of the defendant as to his mental condition or his criminal responsibility, the rule allowed a judge to unseal and make the report available to the defendant earlier. Mass. R. Crim P. 14 (b) (2) (B) (iii). This earlier disclosure, according to rule 14 (a) (3) and subject to the judge's discretion, could in turn trigger an earlier reciprocal disclosure to the prosecution of the defendant's expert report and statements.

The reciprocal discovery provisions of rule 14 (a) (3) did not distinguish between defense expert reports that contained or relied on statements of the defendant and those that did not; all were subject to reciprocal discovery in the court's discretion. If the prosecution's examiner's report did not contain or rely on any statement of the defendant, a judge was not required to find that the defendant had waived his privilege against self-incrimination before ordering the defendant to turn over to the Commonwealth information developed by the defendant's psychiatric expert. The privilege against self-incrimination does not apply to a defendant's statements to the psychiatrist retained by his attorney because these statements were not compelled by the Commonwealth or the court; the defendant voluntarily chose to speak to his defense expert. See *Commonwealth v. Seabrooks,*

433 Mass. 439, 451 (2001) (admission in evidence of defendant's statements to psychologist did not violate privilege against self-incrimination where State did not compel defendant to speak to psychologist).[10]

Nevertheless, disclosure to the prosecution of the defense expert's reports and statements must still wait until the defendant decides whether the expert will testify at trial based in whole or in part on the defendant's statements to the expert, because, until that decision is made, the defendant's statements to a defense expert retained by his attorney are protected by the attorney-client privilege. Reports and statements arising from such communications, while not within the compass of a defendant's privilege against self-incrimination, *are* protected by the work product doctrine. See *Commonwealth* v. *Bing Sial Liang*, 434 Mass. 131, 138 (2001), quoting *United States* v. *Nobles*, 422 U.S. 225, 238 (1975) ("work product protection of rule 14 extends to an attorney's legal staff, for 'attorneys often must rely on the assistance of . . . agents in the compilation of materials in preparation for trial' "); *Commonwealth* v. *Haggerty*, 400 Mass. 437, 441 (1987) (defense expert opinion subject to reciprocal discovery only when defendant intends to call expert as witness). Before a defendant decides that the defense expert will testify at trial, the role his examining psychiatrist holds is that of a consultant to the defense attorney on the issue of criminal responsibility, and the psychiatrist's discussions with the defendant are therefore protected by the attorney-client privilege. Once the defendant decides to call the psychiatrist as a witness, however, the expert is no longer a defense consultant, but a trial witness. When this expert witness testifies at trial to the defendant's statements or rests his opinion in whole or in part on such statements, the defendant waives any attorney-

---

[10]We have not carved out an exception to the defendant's obligation to provide reciprocal discovery of "statements of those persons whom the defendant intends to call as witnesses" under Mass. R. Crim. P. 14 (a) (1) (B), as amended, 444 Mass. 1501 (2005), to exclude prior written statements made by the witness preserving what the defendant previously said to that witness. See *Commonwealth* v. *Durham*, 446 Mass. 212, 213-214, 219-221, cert. denied, 549 U.S. 855 (2006) (*Durham*) (order of reciprocal discovery requiring defendant to furnish Commonwealth with prior statements of witnesses to be called at trial, whether by Commonwealth or defendant, is lawful and "violates no Federal or State constitutional right of the defendant").

client privilege or work product doctrine protection that previously shielded from discovery his communications with the defense expert and the written reports and statements prepared by that expert witness. See *United States* v. *Nobles, supra* at 239-240 (communications to attorney's agent protected under attorney-client privilege, but defendant waives privilege with respect to matters covered in agent's testimony where defendant elects to call agent as witness).

In 2004, we adopted substantial revisions to rule 14. Among these revisions was an expansion of the category of mandatory discovery for the defense, which now included "[i]ntended expert opinion, *other than evidence that pertains to the defendant's criminal responsibility and is subject to subdivision (b)(2)*" (emphasis added).[11] Mass. Crim. P. 14 (a) (1) (A) (vi). Because the prosecution was required under the revised rule to provide mandatory discovery to the defendant at or before the pretrial conference, see Mass. R. Crim. P. 14 (a) (1) (A), we needed to exclude from mandatory discovery the prosecution's expert opinion regarding criminal responsibility, which remained subject to rule 14 (b) (2) and therefore would be filed with the court and sealed until at or near the commencement of trial.

Another revision to rule 14 was to make reciprocal discovery mandatory on the prosecution's delivery to the defendant of all information required under rule 14 (a) (1). Mass. R. Crim. P. 14 (a) (1) (B), as amended, 444 Mass. 1501 (2005)[12]; Reporters' Notes to Rule 14 (a) (1) (B), Mass. Ann. Laws Court Rules,

---

[11]Rule 14 (b) (2) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), which incorporated the elements of the protective order in *Blaisdell*, remains, apart from minor revisions, essentially unchanged from the 1979 version.

[12]The provision in Mass. R. Crim. P. 14 (a) (1) (B), as amended, 444 Mass. 1501 (2005), regarding reciprocal discovery reads in its entirety:

"Following the Commonwealth's delivery of all discovery required pursuant to subdivision (a) (1) (A) or court order, and on or before a date agreed to between the parties, or in the absence of such agreement a date ordered by the court, the defendant shall disclose to the prosecution and permit the Commonwealth to discover, inspect, and copy any material and relevant evidence discoverable under subdivision (a) (1) (A) (vi), (vii) and (ix) which the defendant intends to offer at trial, including the names, addresses, dates of birth, and statements of those persons whom the defendant intends to call as witnesses at trial."

Rules of Criminal Procedure 1489-1490 (LexisNexis 2008-2009) (prosecution receives discovery only after it has produced discovery for defense). Prior to the 2004 revision, reciprocal discovery had been subject to the judge's discretion. See *Commonwealth* v. *Durham*, 446 Mass. 212, 234, cert. denied, 549 U.S. 855 (2006) (*Durham*). Because rule 14 (a) (1) (A) (vi) excludes from the Commonwealth's automatic discovery obligations expert opinion evidence "that pertains to the defendant's criminal responsibility and is subject to subdivision (b) (2)," and rule 14 (a) (1) (B) now requires the defendant to disclose to the prosecution evidence "discoverable under subdivision (a) (1) (A) (vi)," the court infers that in modifying rule 14, we intended that rule 14 (a) "not apply to discovery related to the defense of criminal responsibility, because all procedures and provisions applicable to such discovery are set out in rule 14 (b) (2)." *Ante* at 319. This is not a fair inference for two reasons.

First, the exclusion in our revised rule 14 (a) (1) (A) (vi) simply means that expert opinion evidence that pertains to the defendant's criminal responsibility is beyond the scope of mandatory discovery and therefore falls, as it did under the earlier version of the rule, within the rubric of discretionary discovery. Subdivision (b) (2) therefore continues to control the scope of the judge's discretion regarding disclosure of the prosecution's expert witness report; but it is silent as to discovery of the written statements and reports of the defendant's expert. Under the original rule 14 promulgated in 1979, *all* expert discovery fell within the rubric of discretionary discovery, and once the prosecution had furnished discovery of its expert opinion evidence to the defendant, a trial judge could order the defendant to provide reciprocal discovery regarding the expert witnesses the defendant intended to call at trial, including those who would testify to the defendant's lack of criminal responsibility. There is no reason to believe that by imposing a mandatory reciprocal discovery obligation on defendants in the 2004 revisions, we intended to eliminate the judge's authority to order reciprocal discovery of expert psychiatric opinion. If we had intended such a result, one would think our intent would have been reflected in the language of the revised rule or, at a minimum, in the Reporters' Notes.[13] The silence of both sources on this issue

_____

[13]In fact, the Reporters' Notes to the 2004 revision of Rule 14, Mass. Ann.

speaks loudly to our intent to leave the judge's discretionary authority unchanged with regard to reciprocal discovery in this context.

Second, we said in 1984, and again in 2006, that rule 14 favors "liberal discovery." *Durham, supra* at 221, 222, quoting *Commonwealth* v. *Paszko*, 391 Mass. 164, 188 (1984). In *Commonwealth* v. *Paszko, supra* at 187-188, applying the policy of "liberal discovery" we said was embodied in the rule, we affirmed a judge's reciprocal discovery order requiring a defendant to disclose to the prosecution the prior statements of witnesses the defendant intended to call at trial that were included within the defendant's investigator's report, even though under Federal law such statements would have been deemed protected attorney work product. We stated that the "policy of our rules is that the availability of statements of nonparty witnesses gathered by an adversary serves a truth-enhancing function . . . that outweighs any resulting inconvenience or potential disincentive to lawyers who obtain and preserve such statements in written form." *Id.* at 188. In reaching our decision, we noted that similar witness statements had been provided by the prosecution to the defense and used by defense counsel for impeachment purposes. With this in view, we declared that a "defendant is not constitutionally entitled to a discovery system that operates only to his benefit." *Id.*

In *Durham, supra* at 213-214, which was decided after adoption of the revised rule 14 but applied the pre-2004 version, *id.* at 213 n.1, we affirmed a judge's reciprocal discovery order requiring a defendant to disclose prior statements of witnesses that the Commonwealth, not the defendant, intended to call at trial. Explaining that the "trial process seeks to ascertain the truth," *id.* at 226, and that "criminal trials are matters of justice and not sporting events," *id.* at 229, we discussed the importance of reciprocal discovery in ensuring that "both sides are given a fair opportunity to investigate the veracity of [witness] statements and are not faced with confronting them for the first time at trial." *Id.* at 225. The court was sharply split in the *Durham*

Laws Court Rules, Rules of Criminal Procedure 1483 (LexisNexis 2008-2009), begin by stating: "This rule is based on the concept of reciprocity and has as its aim full pretrial disclosure of items normally within the range of discovery."

case as to whether reciprocal discovery applied to a defense investigator's report of prior statements made by witnesses called by the prosecution. All seven Justices agreed, however, that rule 14 permitted a judge to order reciprocal discovery of prior statements made by persons whom the defendant intended to call as witnesses at trial. See *Durham, supra* at 233 (Cordy, J., dissenting, with whom Marshall, C.J., and Ireland, J., joined). Justice Cordy declared that "[r]equiring discovery of such statements is in line with the modern trend to guard against surprise defenses, thereby ensuring that both prosecutor and defendant are ready to argue the principal issues in the case at trial."[14] *Id.* In view of our strong belief in liberal discovery, which the *Durham* case restated in 2006, it would be astonishing if in revising rule 14 two years earlier, we had intended to forbid reciprocal discovery of the prior statements of a witness the defendant intended to call at trial regarding the defendant's lack of criminal responsibility.

From this history, and from my interpretation of rule 14, I conclude that a judge has discretion to order a defendant to disclose expert opinion evidence pertaining to the defendant's criminal responsibility after the judge discloses to the defendant the expert opinion evidence prepared by the prosecution's expert examiner under rule 14 (b) (2), which will occur only after the defendant waives the attorney-client privilege regarding his discussions with the defense expert psychiatrist, either by having the expert witness testify at trial to the defendant's statements; or by offering in evidence the expert's opinion that rests in whole or in part on such statements; or by committing in counsel's opening statement to offer such evidence. The expert opinion evidence that may be ordered disclosed includes all "statement[s]" of the expert witness, which, as defined in rule 14 (d), includes not only expert reports but also all relevant writings prepared by the witness "other than drafts or notes that have been incorporated into a subsequent draft or final report." *Id.*

---

[14]In fact, defenses based on mental illness or disease were among the particular "surprise defenses" to which Justice Cordy specifically referred, noting with approval that the off-setting provision for pretrial discovery under rule 14 (b) fell within the trend toward reciprocal discovery that served to reduce such surprises. See *Durham, supra* at 240 (Cordy, J., dissenting, with whom Marshall, C.J., and Ireland, J., joined).

As discussed earlier, a psychiatrist testifying as an expert witness for the defense who has not disclosed his interview notes and psychological test results could on the witness stand "cherry pick" certain statements of the defendant that supported his opinion and ignore those that did not, and could misread or mischaracterize test results, all without risk of being held to account for such conduct on cross-examination. Without access to the expert's written work product, a prosecutor would be unaware of these shadings and omissions and, as a result, would be unable to reveal them to the jury. "[W]e have repeatedly emphasized the importance that cross-examination plays in the 'fact finder's assessment of the truth.' " *Durham, supra* at 230 (Marshall, C.J., dissenting), quoting *Commonwealth* v. *Vardinski*, 438 Mass. 444, 450 (2003).

The Commonwealth would have been unfairly disadvantaged if it had been denied discovery of the written statements, test results, and expert report on which Dr. Brown relied in reaching his opinion. Without this discovery, the prosecutor, in cross-examining Dr. Brown, would not have been able to point to statements made by the defendant to Dr. Brown, which he failed to mention on direct examination, that failed to support his opinion that the defendant at the time of the killing was unaware of her surroundings, unaware of her actions, and not criminally responsible for her conduct. It was within the judge's discretion to assure that the jury would have an opportunity to consider all of the information that Dr. Brown reviewed in formulating his opinion, not just a truncated portion favorable to the defendant. See *United States* v. *Nobles*, 422 U.S. 225, 241 (1975). "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played" (footnote omitted). *Williams* v. *Florida*, 399 U.S. 78, 82 (1970).

I conclude, therefore, that neither the trial judge nor the single justice erred in ordering the defendant to disclose to the prosecution Dr. Brown's expert report, the detailed notes of his interview of the defendant (as those were not incorporated into his final report), and the results of the psychological tests he considered. The only error was in the timing of the disclosure of the interview notes and test results, which should not have been ordered until after the defendant's opening statement. In

that opening statement, the defendant committed to present the expert testimony of Dr. Brown, which was based "in whole or in part upon statements of the defendant as to . . . [her] mental condition at the time of, or criminal responsibility for, the alleged crime." Mass. R. Crim. P. 14 (b) (2) (B) (iii). With that commitment by defense counsel, the defendant waived both her privilege against self-incrimination and her attorney-client privilege as to statements she had made to her attorney's expert consultant, Dr. Brown. She likewise surrendered any protection she may have enjoyed under the work product doctrine with respect to Dr. Brown's writings regarding his evaluation of the defendant. The defendant's waiver of her privilege against self-incrimination in the opening statement justified the disclosure of Dr. Kelly's expert report to the prosecution and to the defense, and this disclosure in turn justified the order of reciprocal discovery requiring the defendant to disclose Dr. Brown's report, testing data, and interview notes.

This error in timing was not constitutional in nature; it involved a breach of the attorney-client privilege that protected the defendant's communications with Dr. Brown until the defendant waived that privilege by committing at trial to calling Dr. Brown to the witness stand. The error did not involve a breach of the defendant's privilege against self-incrimination under the Fifth Amendment to the United States Constitution or art. 12 of the Massachusetts Declaration of Rights. Consequently, we should apply the prejudicial error standard, which requires us to ask whether we are "sure that the error did not influence the jury, or had but very slight effect." Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994), quoting Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 445 (1983). Here, we can say with fair assurance that the judgment of conviction was not substantially swayed by the error, and that the error was nonprejudicial. Id. The defendant has given us no reason to believe, and I find none after reviewing Dr. Kelly's testimony, that Dr. Kelly's testimony at trial on February 23, 2006, would have been any different or any less persuasive to the jury had Dr. Kelly first seen Dr. Brown's notes and test results after opening statements on February 16, 2006, rather than on January 27, 2006.

Because I conclude that the only error regarding reciprocal

discovery was one of timing and that this error was harmless when considered in view of the entire record, I respectfully dissent.