SUPERIOR COURT 
 
 COMMONWEALTH VS. CHRISTOPHER REGAN

 
 Docket:
 1877CR00682
 
 
 Dates:
 December 16, 2020
 
 
 Present:
 /s/Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS PHYSICAL AND DERIVATIVE EVIDENCE FROM A WARRANTLESS SEARCH AND SEIZURE (Paper No. 9)
 
 

             Defendant Christopher Regan ("Regan") is charged with five counts of possession of explosive, destructive, or incendiary devices or substances in violation of G.L. c. 266, § 102(c). He has moved to suppress contraband and other items seized by the Beverly Police Department ("BPD") and the Massachusetts State Police ("MSP") on June 29, 2018, from a rental commercial van parked in a condominium complex in Beverly.
            On November 18, 2020, the Court conducted an evidentiary hearing on Defendant's Motion To Suppress Physical And Derivative Evidence From A Warrantless Search And Seizure ("Motion") (Paper No. 9). The Court heard testimony from Officer Ryan Hegarty ("Hegarty") of the BPD and Sgt. Paul Horgan ("Horgan") of the MSP, and it received in evidence thirteen exhibits, including photographs and a recording of 911 calls.[1] Regan did not testify and introduced no exhibits.
---------------------------
[1]The Court admitted the BPD Police Officer's Formal Report ("Police Report") as Exhibit 13 for the limited purpose of showing the list of items that Hegarty seized and inventoried from the van.
                                                            Page 1 of 18
            As is fully explained below, after thorough consideration of the submissions and arguments of counsel, and the evidence presented at the hearing, the Motion is DENIED.
FINDINGS OF FACT
            The Court makes the following findings, which are based on the credible evidence produced at the hearing and the reasonable inferences the Court has drawn from the evidence. Furthermore, the Court finds that the testimony of Hegarty and Horgan was truthful and accurate on the relevant and material points. Thus, the Court credits their testimony in its entirety.[2]
            1. 911 Calls Received By BPD 
            On June 29, 2018, at approximately 9:15 PM, the BPD received two 911 calls reporting fireworks being set off. The callers reported hearing what sounded like gunshots or fireworks. The callers stated they believed a white van with "$19.99" depicted on the side was involved. One caller said she saw the white van leaving St. Mary's Cemetery ("Cemetery") after the fireworks were set off and the other caller said he observed the van leave the Cemetery and circle a residential area on Northridge Rd.
            More specifically, the substance of the 911 calls are as follows:
                        1. A female caller requested "police to patrol inside St. Mary's Cemetery because they're starting to shoot off the fireworks up here. The person that did it, I saw a white van leaving the cemetery, so there's nobody here right now, but when it gets dark, they come up here and start shooting them off."
                        2. A male caller stated, "About an hour ago. I live at Northridge homes, #82, which is closest to the cemetery. We heard two loud pops that sounded like fireworks, but could've been gunshots. But, then I saw two vehicles leave the cemetery. One was a U-Haul van and I just saw them drive around inside the Northridge homes area,
---------------------------
[2] The Court sets forth additional findings of fact in the Conclusions of Law section, infra.
                                                            Page 2 of 18
and I've never seen it before. I thought it was kind of weird, so I thought I'd give you a call. The van said, like, '1999' on it. I felt it was a little suspicious. [The van is] not here anymore. They drove around in a circle. [It's] definitely the same van [as I saw leave the cemetery] when I heard the bangs."
Exhibit 1, BPD recording.
            2. Police Respond To 911 Calls
            On June 29, 2018, Hegarty was in full uniform and working alone in a marked police cruiser. He was operating one of three police vehicles that the BPD dispatched in response to the 911 calls. Officer Zwicker ("Zwicker")[3] and Det. Joshua Pickett ("Pickett") were operating the other responding police vehicles. Zwicker was operating a marked police cruiser.
            Hegarty drove to the Beverly High School parking lot and met up with Zwicker and Pickett. From there, they drove their respective police vehicles toward Northridge Road. On the way, they observed (and heard) a large firework display coming from inside the Cemetery. In response, Hegarty and Zwicker proceeded to the Cemetery.
            The Cemetery has two entrances for motor vehicles, which serve an interior road that forms a horseshoe inside the cemetery grounds. The interior of the Cemetery also has a pedestrian path. Adjacent to the rear of the Cemetery is a condominium complex located on Northridge Road.
            Hegarty and Zwicker entered separate entrances to the Cemetery in their police cruisers and drove in the direction of the fireworks (i.e., toward the rear of the Cemetery). Upon arrival at rear of the Cemetery, Hegarty observed two men and a female standing near a cloud of smoke. On the ground nearby, Hegarty observed what
---------------------------
[3] The Court was not provided Zwicker's first name.
                                                            Page 3 of 18
appeared to be a spent "shell" or "casing" from fireworks. He exited his cruiser and immediately smelled burnt fireworks. Hegarty asked the group of three individuals, "Did you see fireworks?" One of the men, later identified as Regan, responded, "Yes, it wasn't us, it was other guys that went that way." Hegarty asked them for their names. The female said her name is "Taylor Conway." Regan provided his name and the other male identified himself as "Anthony Abbott."
                        3. White U-Haul Van Located By Police 
            In the meantime, Pickett drove his police vehicle to the Northridge condominium complex and observed an unoccupied white van matching the description of the 911 callers parked in a visitor parking space near the rear of the Cemetery. Pickett found the van parked approximately 30 to 40 feet from the condominium residential buildings and there were other vehicles parked nearby. Pickett reasonably believed that the van was recently operated because the hood of the van was warm to the touch.
            Pickett radioed Hegarty and Zwicker (who were in the Cemetery), and reported he located the white van described by the 911 callers. Pickett reported he observed boxes of "high priced fireworks" inside the white van. Upon learning this information, Hegarty asked Regan and his two companions "if they were involved with the motor vehicle." They responded "no." Hegarty asked them to walk to the location at which the van was located, and meet him and other officers there. They agreed and walked the very short distance to the location of the van. Hegarty and Zwicker drove their respective police vehicles and met them and Pickett near the white van.
                                                            Page 4 of 18
            The van had a front cabin area for a driver and a passenger. It had a single door with a window on each side of the front cabin. Immediately behind the front cabin was a large cargo area. The van had a double set of doors on the passenger side of the rear cargo area with a large window on the top of each door. The rear of the van contained another set of double doors with a large window on the top of each door. The exterior of the front driver's side and passenger side doors contained the word "U-Haul' in large black letters, and the words "Truck Share 24/7' in smaller white and orange letters. The exterior of both sides of the rear cargo area stated "$19.95" in very large green lettering along with other U-Haul-related information.
            4. Observations Of Van And Defendant's Denial Of Involvement 
            Upon Hegarty's arrival at the van in the Northbridge condominium complex, he observed Regan and the two companions standing nearby as he requested. Pickett again told Hegarty that the van contained boxes of "high priced fireworks." Hegarty then asked Regan and his two companions if they "had any involvement" with the van and they each said "no" and walked away.
            Hegarty and Pickett then looked into the van windows and used a flashlight to illuminate the interior. Hegarty and Pickett looked into the side cargo-area windows and observed a large white box inside the cargo area. The box contained the following words: "Fireworks... Handle Carefully... Keep Fire Away." Immediately above those words was a large red or orange sticker stating the following: "1.4 G 1." Based on his training and experience, Pickett believed "1.4" is the designation used to label the presence of consumer grade fireworks, which he believed to be illegal to possess in Massachusetts. In response, the officers contacted Sgt. Vanliere, the BPD patrol
                                                            Page 5 of 18
supervisor, who contacted the shift commander, an unnamed lieutenant. The shift commander called the MSP Bomb Squad because of concern that the van contained explosive materials in a residential area.
            While waiting for the MSP Bomb Squad to arrive, Hegarty looked into the van through the driver's side window and observed a wallet on a small shelf in the driver's side of the front dashboard. See photographs at Exhibits 10 —11. The wallet lay partially open with portions of credit cards in view. Inside the partially open wallet, Hegarty observed the edge of a Visa credit card with the name "Christopher J. Regan" on it. See photograph at Exhibit 12. Hegarty also contacted U-Haul customer service at this time and learned that the name of the person who rented the van was Christopher Regan.
            5. Sgt. Paul Horgan's Training And Experience
            As of June 2018, Horgan had worked for approximately 24 years in various positions at the MSP Fire Marshal's Office. For approximately the prior 12 years, Horgan worked in the Bomb Squad within the Fire Marshal's Office.
            Horgan received extensive training in the composition, classification, manufacturing, labelling and transportation of explosives, such as fireworks. He has been a certified bomb technician since joining the Bomb Squad. Horgan earned that designation by attending a six-week training course jointly administered by the Federal Bureau of Investigation and the United States Department of Defense. He has been recertified as a bomb technician every three years by attending a weeklong course. Horgan has attended several lengthy explosives-related training courses administered by the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). These include a training course entitled "Advanced Explosive Disposal Techniques,"
                                                            Page 6 of 18
which was an 80-hour course, and a one-week course regarding homemade explosive devices.
            In general, fireworks are classified as commercial grade, consumer grade, or homemade fireworks (i.e., "M class explosive devices"). Horgan explained his belief that certain authorized persons may legally possess and use commercial grade fireworks under Massachusetts law with a permit issued by the State Fire Marshal's Office. He further explained his belief that: (a) it is illegal to possess or use consumer grade fireworks in Massachusetts; and, (b) the United States Department of Transportation ("US DOT") requires consumer grade fireworks to be affixed with a label that says "1.4" on it.
            Consumer grade fireworks can cause significant bodily injury such as disfigurement, dismemberment, and death, and can cause significant property damage.
            6. Sgt. Horgan Responds To Scene 
            On June 29, 2018, at approximately 11:00 p.m., the MSP directed Horgan to respond to the white van, which remained parked in the same visitor parking space at the Northridge condominium complex at which Pickett first discovered it.
            Horgan arrived approximately 15 minutes later. Upon arrival, he observed several BPD officers surrounding the van. The officers provided him with information regarding the 911 calls and their observations of the contents of the van. Horgan then looked into the van's windows and examined the interior of the van. He observed what he reasonably believed were boxes of "thousands of dollars' worth" of consumer grade fireworks (i.e., labelled "1.4"). Upon seeing this, Horgan became very concerned for the safety of people in the nearby residential buildings and vehicles parked nearby.
                                                            Page 7 of 18
Therefore, he directed the BPD officers to have the van towed to a safe area so that he could closely inspect its contents.
            7. Tow Truck Responds To Scene And Tows Van To BPD 
            Approximately 15 minutes later, a tow truck arrived to tow the van. The doors to the van were locked. However, Horgan wanted to perform a cursory inspection of the interior of van before the tow truck towed it to ensure that it would be safe to do so. Thus, at Horgan's direction, the tow truck operator unlocked the passenger door (via the window). Horgan then entered the interior of the van and performed a cursory inspection of its contents. He observed that the van was "completely packed" with consumer grade fireworks and homemade explosive devices. He also observed materials used to make homemade explosive devices, such as cardboard cylinders and bags containing "precursor powders" (i.e., substances used to make devices explode). One such bag contained a label marked "potassium percolate," which is used for oxidation of explosive fuels, and another bag contained a label marked "aluminum powder," which is used as an explosive fuel. Horgan understood that the combination of those two substances makes "flash powder" used to ignite fireworks.
            Horgan then directed the tow truck operator to tow the van to the rear of the BPD police station. He also directed that two marked police cruisers escort the van to the police station, one in front of the van and one behind the van.
            At the time, the BPD had a written policy in place concerning the towing of vehicles. See Exhibit 8, Beverly Police Department, Towing and Abandoned Vehicles Guidelines (eff. September 28, 2016) ("Towing Guidelines"). Among the reasons that a vehicle may be towed pursuant to the Towing Guidelines are when "[t]he vehicle
                                                            Page 8 of 18
constitutes an obvious hazard" and when "[t]he vehicle may contain evidence of a crime and cannot be processed at the scene." Exhibit 8, p. 2, §§ IV(a) and (g).
            8. Search And Inventory Of Van At The BPD Facility 
            In the rear of the BPD police station, Horgan conducted an in-depth inspection of the interior of the van. He found "boxes and boxes of 1.4" consumer grade fireworks and 160 M class homemade explosive devices. Horgan removed two samples of fireworks from the van and exploded them, thus confirming they were operational explosive devices.
            Horgan then carefully removed the contraband from the van and Hegarty conducted an inventory of the contents as Horgan removed it.
            9. BPD Motor Vehicle Inventory Policy 
            At the time, the BPD had a written policy concerning the conducting of inventory searches of motor vehicles. See Exhibit 9, Beverly Police Department, Policy and Procedure No. 640, Motor Vehicle Inventory Searches (eff. July 23, 2001) ("MV Inventory Policy"). The MV Inventory Policy requires the officer to prepare a "Tow Motor Vehicle Inventory Form" ("Inventory Form"), which "shall be completed by the investigating officer . . . at the time of the inventory," and "shall be printed and signed, and . . . filed with any report of investigation or arrest." Exhibit 9, p. 3, §II(2). The MV Inventory Policy also requires the Inventory Form to "indicate the reason for the tow or impoundment; the name of the operator, if any; . . . make, registration number and V.I.N." Id. at p. 4, §I1(5).
                                                            Page 9 of 18
            Hegarty failed to prepare an Inventory Form regarding the search and seizure of the contents of the van. Instead, Hegarty prepared a detailed list of the items of contraband that were removed by Horgan from the van, such as "10 LB bag of white powder [] Potassium Percholate," and entered it into a police report he authored. See Exhibit 13, Police Report. However, although the detailed list of items of contraband in the Police Report is close to four pages long, Hegarty apparently failed to inventory and document noncontraband items, such as clothing and "personal effects" that he observed inside the van. Hegarty complied with the MV Inventory Policy in all other respects.
CONCLUSIONS OF LAW
            As stated, Regan seeks the suppression of all items seized by police from the van and all observations thereof. He argues that the Commonwealth failed to prove the police had probable cause to search the van pursuant to the automobile exception of the warrant requirement or that he abandoned the van in the constitutional sense. Regan also argues that the Commonwealth failed to prove the search was justified as an inventory search because the search was investigatory in nature and the officers failed to adhere to the MV Inventory Policy.
            For its part, the Commonwealth argues that the police were justified in seizing and searching the van for three reasons. First, the police had probable cause to believe the van contained evidence of a crime and thus the automobile exception applies. Second, Regan abandoned the van and thus had no expectation of privacy in its contents. Third, given the danger to public safety the contents of the van posed, the
                                                            Page 10 of 18
police had the authority to impound the van and conduct an inventory search of its contents.
            I. THE REGULATION OF FIREWORKS AND EXPLOSIVES IN MA 
            In Massachusetts, it is a misdemeanor, punishable by a fine, to possess, have under one's control, use, explode, or cause to explode "fireworks." G.L. c. 148, § 39, 4th par.; see also Commonwealth v. Kirschner, 67 Mass. App. Ct. 836, 843 n.5 (2006) ("Pursuant to this section, the possession, control, use, or explosion of fireworks is prohibited and punishable by a fine of not less than ten dollars nor more than one hundred dollars."). Moreover, Massachusetts law directs "[a]ny officer qualified to serve criminal process [to] seize all of the fireworks mentioned herein without a warrant, and the fireworks seized shall, upon conviction of such violation, be forfeited to the commonwealth." G.L. c. 148, § 39, 4th par. "For the purposes of this section the word `fireworks' [ include[s] compositions, substances or other articles and . . . blank cartridges . . . in which explosives are used, . . . [including] firecrackers, cherry bombs, silver salutes, M-80's, torpedoes, sky—rockets, Roman candles, sparklers, rockets, wheels, colored fires, fountains, mines, serpents, or other fireworks of like construction or any fireworks containing any explosive or flammable compound, or any tablets or other device containing any explosive substance." G.L. c. 148, § 39, 2nd par.
            The US DOT "classifies those materials which [it] has designated as hazardous materials for purposes of transportation and prescribes the requirements for shipping papers, package marking, labeling, and transport vehicle placarding applicable to the shipment and transportation of those hazardous materials." 49 CFR § 172.1. The US DOT has promulgated "a Hazardous Materials Table [ ] in [which it] designates the
                                                            Page 11 of 18
materials listed therein as hazardous materials for the purpose of transportation of those materials[,] . . . identifies the hazard class[,] . . . gives the proper [or preferred] shipping name[, and] specifies or references requirements . . . pertaining to labeling [and] packaging." 49 CFR § 172.101(a).
            The US DOT has designated consumer fireworks as "hazardous materials for the purpose of transportation" and classified them as "Division 1.4." Id. The US DOT requires consumer fireworks to be affixed with an "EXPLOSIVE 1.4" label and requires the label to appear a certain way.[4] Id. and 49 CFR § 172.411(c); see also G.L. c. 266, § 101 (defining "Explosive" as "any element, compound or mixture that is manufactured, designed or used to produce an explosion and that contains an oxidizer, fuel or other ingredient, in such proportion, quantity or packing that an ignition by fire, friction, concussion, percussion or detonation of the element or of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures, release of heat or fragmentation is capable of producing destructive effects on contiguous objects or of destroying life or causing bodily harm including, but not limited to, all material which is classified as division 1.1, 1.2, 1.3, 1.4, 1.5 or 1.6 explosives by the United States Department of Transportation.") (emphasis added).
---------------------------
[4] The Court has reproduced the label required by US DOT for consumer fireworks, "except for size and color," 49 CFR § 172.411(c), at Addendum A.
                                                            Page 12 of 18
            II. THE CONSTITUTIONAL FRAMEWORK
            It is axiomatic that the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights protect persons from unreasonable searches and seizures. Commonwealth v. Sheridan, 470 Mass. 752, 756 (2015). "A warrantless search such as [occurred in this case] is presumptively unreasonable under both the Fourth Amendment and art. 14 unless one of the 'few specifically established and well-delineated exceptions' to the warrant requirement apply." Commonwealth v. Buckley, 478 Mass. 861, 875 (2018) (quoting Commonwealth  v. Johnson, 461 Mass. 44, 48 (2011), quoting Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971)). The automobile exception, Sheridan, 470 Mass. at 759, and the plain view exception, Commonwealth v. Sliech-Brodeur, 457 Mass. 300, 306 (2010) (citations omitted), are two such well-recognized exceptions to the warrant requirement.
            Moreover, "[f]or evidence seized without a warrant to be admissible, the Commonwealth bears the burden to establish that a warrantless search fell within an exception to the warrant requirement." Commonwealth v. Davis, 481 Mass. 210, 217 (2019) (internal and external citations omitted).
III. THE COMMONWEALTH MET ITS BURDEN TO PROVE THAT THE  SEIZURE AND SEARCH OF THE VAN, AND SEIZURE OF THE  CONTRABAND INSIDE IT WERE PROPER PURSUANT TO THE  AUTOMOBILE EXCEPTION TO THE WARRANT REQUIREMENT 
            "'Under the automobile exception, a warrantless search of an automobile is permitted when police have 'probable cause to believe that a motor vehicle on a public way contains contraband or evidence of a crime, and exigent circumstances make obtaining a warrant impracticable." Sheridan, 470 Mass. at 756 (citation omitted). However, "'when an automobile is stopped in a public place with probable cause, no
                                                            Page 13 of 18
more exigent circumstances are required beyond the inherent mobility of an automobile itself to justify a warrantless search of the vehicle." 5 Id. (citation and ellipsis omitted) (emphasis added). "The issue of paramount importance is whether the police, prior to the commencement of a warrantless search, had probable cause to believe that they would find the instrumentality of a crime or evidence pertaining to a crime in the vehicle." Davis, 481 Mass. at 220 (citation omitted).
            Here, prior to impounding and towing the van to the BPD facility, the officers had ample probable cause to believe the van contained contraband. The information provided by the two 911 callers was "sufficiently reliable to support reasonable suspicion" that the van was involved in criminal activity (i.e., the exploding or "setting off' of consumer grade fireworks in violation of G.L. c. 148, § 39, 4th par.). See Commonwealth v. Manha, 479 Mass. 44, 46 (2018) ("To determine whether the transmitted information provided by a 911 caller is sufficiently reliable to support reasonable suspicion, we apply the two-pronged Aguilar-Spinelli test; that is, we look to the caller's basis for knowledge as well as the veracity of the source of the information."). The police operator told both 911 callers that the calls were being recorded, both callers reported their firsthand observations, and both were identifiable by the police. See id. at 46 — 48 (finding anonymous 911 caller to have satisfactory basis of knowledge where she "reported her firsthand observations," and sufficient
---------------------------
[5] When dispensing with the exigency requirement of the automobile exception, our appellate decisions often refer to the inherent mobility of a vehicle encountered by police on a "public way." However, it is clear to the Court that the vehicle being in a "public place" is sufficient to dispense with the exigency requirement. See e.g., Commonwealth v. Eggleston, 453 Mass. 554, 557 - 558 (2009) (no exigent circumstances needed to search motor vehicle parked in a tire store parking lot when officers had probable cause to believe motor vehicle contained contraband).
                                                            Page 14 of 18
veracity because she was identifiable, she was told her call was being recorded, and the information supplied was corroborated by observations of the police). Moreover, Hegarty corroborated the information provided by the 911 callers when he observed fireworks being set off as he neared the Cemetery, and when he smelled burnt fireworks and observed a fireworks "shell casing" in the area of the Cemetery from where he observed the fireworks explode.
            One of the 911 callers reported seeing a white van leaving the Cemetery with "(t]he person that did it (in it]." The other 911 caller reported seeing a U-Haul van (with "1999" written on it) involved in setting off the fireworks leave the Cemetery, and drive around the grounds of the Northridge condominium complex. In response to the 911 calls, Pickett quickly located a van that matched the callers' descriptions. Hegarty and Pickett looked into the van windows and observed a large white box containing the words: "Fireworks... Handle Carefully... Keep Fire Away... 1.4 G 1." The officers thus reasonably believed that the box contained what the label said it contained, fireworks, which are illegal to possess in Massachusetts.[6] Additionally, Horgan, highly trained and experienced in the identification and functioning of fireworks, looked inside the van's windows and observed what he reasonably believed were boxes of illegal, dangerous consumer grade fireworks. In fact, two boxes contained labels visible in plain view that
---------------------------
[6] After looking inside the van, Pickett told Hegarty he believed "1.4" is the designation used to label the presence of consumer grade fireworks, which are illegal to possess in Massachusetts. The Court cannot fully credit that testimony because the Commonwealth did not present any evidence of Pickett's training and experience. Nevertheless, Pickett and Hegarty reasonably believed the box contained potentially dangerous (and illegal) fireworks.
                                                            Page 15 of 18
contained the designation of "1.4" required by the US DOT for consumer grade fireworks.[7] See Exhibits 6 and 7, photographs.
            In sum, the "police officers s[aw], in plain view from a lawful vantage point outside [the] vehicle, an item that itself g[a]ve[] rise to 'probable cause to believe that they would find the instrumentality of a crime or evidence pertaining to a crime in the vehicle." Sheridan, 470 Mass. at 760 (citations and quotations omitted). Therefore, the automobile exception to the search warrant requirement applied, "[b]ecause the observation g[a]ve[] rise to probable cause to conduct a search, [and] the subsequent entry into the vehicle and seizure of the [contraband was] permissible." Id.; see also Commonwealth v. Bostock, 450 Mass. 616, 624 - 625 (2008) (search of truck permissible under the automobile exception because there was probable cause to believe that the truck contained evidence of a break-in of a vehicle, including observations by police of potentially stolen items).[8]
---------------------------
[7]Unlike the empty baggie observed inside a motor vehicle by the well-trained drug investigator in Commonwealth v. Garcia, 34 Mass. App. Ct. 645, 650 — 652 (1993), cited by Regan, the boxes of consumer grade fireworks observed by the police in this case were not "benign objects." Id. at 651.
[8] Regan's citation to Commonwealth v. Kinq, 67 Mass. App. Ct. 823 (2006), in challenging the officers' ability to recognize items as contraband from looking into the van's back window, is not helpful. At issue in Kinq was whether an item allegedly observed by police inside a vehicle through a window was "immediately apparent" to be contraband, a requirement of the plain view exception to the warrant requirement under Article 14. Id. at 828 — 829. However, "[i]t is important to distinguish between the observation of an item in plain view and the seizure of an item in plain view. The observation of an item in plain view 'involves no intrusion into an area in which the defendant has a reasonable expectation of privacy' and does not rise to the level of a search. . . . The seizure of an item in plain view, however, intrudes upon the owner's possessory interest in that item and thus implicates constitutional considerations." Commonwealth v.  Figueroa, 412 Mass. 745, 749 n.6 (1992) (internal and external citations omitted). Here, the Commonwealth does not rely on the plain view exception to justify the seizure and search of the van, and it is doubtful that the plain view exception under Article 14 would apply. See Sheridan, 470 Mass. at 759 (ruling that the plain view doctrine under Article 14 requires, inter alia, "the officer 'come across the object inadvertently.'") (citation omitted).
                                                            Page 16 of 18
            Furthermore, based on Horgan's well-founded public safety concerns, the police were justified in transporting the van to the BPD facility before conducting an in-depth search of its contents. See Commonwealth v. Ehiabhi, 478 Mass. 154, 165 (2017) (recognizing that impoundment of a vehicle is warranted for, inter alia, "'the protection of the public from the dangerous items which might be in the vehicle.") (citation omitted). In fact, once the police had probable cause to search the vehicle, it was "'constitutionally permissible" for them to "'remov[e] [it] to the police station and immediate[ly] search" it there. Commonwealth v. Motta, 424 Mass. 117, 124 (1997) (citation omitted); see also Commonwealth v. Rand, 363 Mass. 554, 561 (1973) (ruling that, where police had probable cause to search a car stopped on a highway, "[t]he police could make that search at the police station because the facts constituting probable cause to make the search continued to exist.").[9] [10]
---------------------------
[9] The Commonwealth's argument that Regan abandoned the van when he purportedly "disclaimed ownership of the van and walked away[, and] he said it did not belong to him" fails for two reasons. First, the evidence, which was that Regan and his two companions told Hegarty they had "no involvement" with the van when asked before walking away, does not support ruling Regan abandoned the van. Second, "[a]bandonment is primarily a question of intent," Commonwealth v. Paszko, 391 Mass. 164, 184 (1984) (citation omitted), and the Commonwealth failed to show Regan intended to abandon the van and its contents.
[10] The Court does not reach the Commonwealth's argument that the van was properly impounded (seized) by police pursuant to the Towing Guidelines and searched pursuant to the MV Inventory Policy. However, the Court doubts the Commonwealth proved that the true purpose of the seizure and search of the van was not investigative. See Davis, 481 Mass. 210, 218 ("Where the police's true purpose for searching the vehicle is investigative, the seizure of the vehicle may not be justified as a precursor to an inventory search, and must instead be justified as an investigative search.") (citation omitted).
                                                            Page 17 of 18
            Therefore, for the forgoing reasons, the motion to suppress is DENIED.
ORDER
            For the above reasons, it is HEREBY ORDERED that Defendant's Motion To Suppress Physical And Derivative Evidence From A Warrantless Search And Seizure (Paper No. 9) is DENIED.
@/s/Jeffrey T. Karp Associate Justice, Superior Court
@December 16, 2020
                                                            Page 18 of 18
xxz